ARTHUR D. CRONIN *vs.* THE NATIONAL SHAWMUT BANK OF BOSTON.

Suffolk.    February 9, 1940. — June 3, 1940.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Broker*, Commission, Insurance broker. *Agency*, What constitutes. *Contract*, What constitutes, Implied.

Evidence did not show that a corporation desiring insurance coverage, by asking a broker to submit a proposal, employed him as its agent to procure the insurance and agreed to pay him a commission for so doing; and, after the broker had procured and submitted a proposal by an insurance company, an awarding by the corporation of the insurance on similar terms to another company through another broker solely because it wished the second broker to have the commission did not render it liable to the first broker on the ground of his having been deprived of a commission through its termination of its relations with him in bad faith or on the ground that it had been unjustly enriched by availing itself of his services.

CONTRACT.    Writ in the Superior Court dated January 21, 1935.

The action was heard by *Williams*, J., who found for the defendant. The plaintiff alleged exceptions.

*R. Spring*, (*G. E. Mears & J. F. Henry* with him,) for the plaintiff.

*R. G. Dodge*, for the defendant.

QUA, J.    This action of contract involves a determination of the alleged right of the plaintiff, an insurance broker, to recover from the defendant in connection with the placing of fire, theft and collision insurance upon automobiles financed through the defendant's "Time Sales Department."

By stipulation the case was submitted to a judge of the Superior Court on the auditor's report and on the evidence given before the auditor as if the witnesses had given the same testimony in open court and the report and exhibits had been offered in evidence there. If the judge should

rule that the plaintiff would have been entitled to go to a jury the judge was to find for the plaintiff in an agreed amount.  Otherwise, the finding was to be for the defendant.  At the hearing before the judge the defendant's counsel stated that he raised no question based on pleadings "so long as the plaintiff's claim was stated to be in contract."  The judge ruled that the evidence and report would not require the submission of the case to a jury and found for the defendant.

The effect of the stipulation and the statement by the defendant's counsel is that the exceptions must be sustained, if on all the evidence, including facts found by the auditor and the evidence introduced before him and later received in court, a jury would have been warranted in finding for the plaintiff for breach of contract in any form. See *Cook* v. *Farm Service Stores, Inc.* 301 Mass. 564.

The auditor's report and the oral evidence summarized in the bill of exceptions are too voluminous to be reproduced here.  An attempt will be made to state enough to indicate the grounds of this decision.

Among the facts found by the auditor are these: In each of the years 1929, 1930 and 1932 the defendant invited various brokers to submit proposals for fire and theft insurance for the time sales department.  The plaintiff submitted a proposal in 1929 which, however, was not accepted.  In the spring of 1934 the plaintiff was asked to submit a proposal for combined fire, theft and collision insurance for a term of three years, which he did, but the defendant took no action in relation to the matter at that time and later the proposal was withdrawn.  In October of that year the defendant solicited proposals for the combined coverage on a three-year basis from several large insurance brokerage firms and agents in addition to the plaintiff.  This was an important piece of insurance business, as it involved total premiums estimated at about $850,000, with broker's commissions of between $30,000 and $40,000.  The plaintiff secured a proposal in writing from the Niagara Fire Insurance Company.  This was one of a group of several associated fire insurance companies, known as the "America

Fore" group. One Gallagher was in charge of the automobile insurance of all of these companies. The plaintiff took up this proposal with one McCarthy, an assistant vice-president of the defendant and manager of the time sales department. Negotiations followed. The plaintiff showed McCarthy a second written proposal of the Niagara company dated October 23, a revision of which "to meet McCarthy's objections" was sent by the plaintiff to McCarthy on October 24, together with a letter from the plaintiff to the defendant dealing primarily with the rate of the plaintiff's own compensation as a broker. Several other brokers also submitted proposals. About November 15 the plaintiff submitted a further revised proposal from the Niagara company. A day or two later McCarthy asked the plaintiff to obtain a "consolidation" of the proposal of November 15 and the plaintiff's letter of October 24. About this time the plaintiff discovered that another firm of brokers, OBrion, Russell and Company, were trying to get from Gallagher the same proposal which he had given to the plaintiff in behalf of the Niagara company. In fact they were being aided in this attempt by two vice-presidents of the defendant, Carroll and Ilg, who were superior officers to McCarthy and who desired OBrion, Russell and Company to have the business in order that one Roosevelt, who was associated with OBrion, Russell and Company through the firm of Roosevelt and Sargent, might share in it. On November 27 at about noon the plaintiff delivered to McCarthy "the precise proposal that McCarthy wanted." This proposal contained an itemized schedule of rates which averaged substantially lower than the "tariff" rates established by the "National Automobile Underwriters Association." Shortly afterwards on the same day Gallagher telephoned the plaintiff that he "felt that he must either give the proposal to OBrion, Russell and Company or withdraw the proposal he had just made on behalf of the Niagara and retire from the picture altogether, with all his America Fore companies." The plaintiff at once saw McCarthy and asked him whether the proposal from the Niagara was the proposal McCarthy wanted for his department as against

any other which the defendant had received, and McCarthy said it was. The plaintiff then told McCarthy that under the circumstances he was going to say to Gallagher that the plaintiff "would not hold it against" Gallagher if the latter found it necessary to "quote" OBrion, Russell and Company. The plaintiff repeated this statement to Ilg. That same afternoon at a meeting of representatives of the defendant, including Carroll, Ilg and McCarthy, and representatives of OBrion, Russell and Company and of the "America Fore" group Gallagher signed a proposal exactly similar to the last proposal which the plaintiff had handed to McCarthy, except that instead of bearing the word "Niagara" at the top the proposal was written on letter paper of the First American Fire Insurance Company, another of the "America Fore" group, and except that in a sentence immediately following the schedule of rates and reading, "All these figures are to be net to us . . . except a commission allowance to Arthur D. Cronin & Company who are being retained to service this account; it being understood that any gross quotations on our behalf to the purchaser of the automobile are to be strictly on a tariff basis and any differences between the above prices and tariff charges are to be considered commission allowance," the name Arthur D. Cronin and Company (the business name of the plaintiff) was struck out and the name OBrion, Russell and Company was substituted. Carroll looked over this proposal, announced that in his opinion the defendant would be involved in unlawful rebating if it accepted it (see G. L. [Ter. Ed.] c. 175, §§ 182, 183, 184), and that the defendant would not accept it. The original copy of this proposal was torn up. Gallagher wrote "void" across a carbon copy. Thereafter at the same interview the discussion continued and finally resulted in a "gentleman's agreement" by which Gallagher orally bound "the insurance" in the First American company, with OBrion, Russell and Company as brokers, "subject to some legal method being later worked out so as to make the rates specified in that proposal the actual rates to be paid by the defendant." Later, with the help of legal advice, "a method of getting

around the paying of" the tariff rates was worked out which was satisfactory to "everybody concerned." On December 8, 1934, the First American issued to the defendant through OBrion, Russell and Company a policy as of October 12 under which the defendant actually paid the rates named in the plaintiff's proposal. Some changes and amendments were made later, including "an elaborate agreement" in September, 1936, designed primarily to remove any difficulty as to the "tariff" rates. All these things would have happened if the plaintiff had been the broker and if the Niagara company had written the policy. This insurance remained in effect until December 31, 1937.

In addition to the foregoing narrative of events the auditor made further general findings that he did not believe that several alleged reasons advanced by the defendant for not accepting the Niagara's proposal of November 27 were true reasons; that the sole reason for giving the business to OBrion, Russell and Company was Ilg's personal friendship for Roosevelt and his desire to have Roosevelt get a share of the commission; that the president of the defendant had given the power of deciding upon the broker to Carroll and Ilg; that the defendant did not agree as alleged in the declaration to accept the plaintiff's proposal provided he procured a certain additional revision thereof; that the plaintiff knew from the beginning that McCarthy had no final authority to bind the defendant, and knew that the final decision lay with senior officers of the defendant, none of whom authorized McCarthy to make such an agreement or clothed him with apparent authority to make it; that McCarthy never did make such an agreement; that the plaintiff, so far as any agreement was concerned, had no right to commissions and had earned none and therefore could not wrongfully be deprived of them by the defendant in bad faith or otherwise; that the plaintiff was the predominating efficient cause of the defendant's obtaining the insurance which it did obtain, but that the plaintiff was never employed by the defendant to do anything; that he was never the defendant's agent for any purpose whatever; that he, with others, was invited to secure and submit proposals from

insurance companies; that there was no express or implied promise by the defendant that if the proposal submitted by the plaintiff should be the lowest or most advantageous to the defendant, it would be accepted; and that the plaintiff knew that the defendant might be guided and influenced by considerations other than those having to do with the precise rates and terms of any given proposal. The auditor further made a general finding for the defendant.

The evidence included in the bill of exceptions adds to the auditor's report nothing having any important bearing upon the grounds of this decision, except that contained in the plaintiff's own testimony, to which reference will hereinafter be made in discussing the several contentions put forward by him.

All of the evidence, including the testimony of the plaintiff himself, is to the effect that the relations between the plaintiff and the defendant out of which this controversy grew, began with the defendant's request for bids or proposals. The plaintiff was not employed as the defendant's agent to do anything in the defendant's behalf. No duties were assigned to him. No authority was delegated to him. So far as appears no terms were given to him which he was authorized or expected to repeat to others, and no conditions were laid down which he was required to meet. He, on his part, assumed no undertaking, fiduciary or otherwise, by which he was bound to make any effort or to bring about any result. Both the plaintiff and the defendant remained free and stood at arm's length. All that occurred was that the defendant indicated to the plaintiff and to other brokers its willingness to receive proposals. The plaintiff's testimony is in entire accord with this theory of the original relation between the parties. He was familiar with the defendant's practice of calling for bids at intervals. He had himself been a successful bidder in 1927. He speaks of submitting "a bid" in 1929, of the business being again "thrown open to bids" in 1931 and of being asked "to bid again." He testified that in June, 1934, Mr. Janisch (a vice-president of the defendant) asked the plaintiff to submit a bid. The plaintiff submitted a written "proposal"

beginning "We are prepared to accept an order for Fire, Theft and Collision Cover . . ." and ending, "If we are awarded this business, it will be our purpose to furnish you, from time to time, with complete statistics . . . ." The plaintiff testified that the employment alleged in his declaration referred to McCarthy's request for a renewal of this proposal. Repeatedly throughout his testimony the plaintiff refers to material which he submitted to McCarthy as a "proposal" or a "bid" or a "quotation." He testified that he appreciated he was "bidding" in competition with others; that he understood the bank asked for competitive bids about once a year; that he "always knew that it was a question whether the bank would accept his proposal or would accept some other proposal."

There is nothing to show that this relationship once begun was enlarged into an agency or an employment during the progress of the conversations which followed. McCarthy's interest in the terms of successive proposals and his suggestions in regard to them were as consistent with the theory that the defendant's attitude was still that of merely receiving proposals from the plaintiff and others as it was with a contract of agency or employment. According to the plaintiff's testimony McCarthy at one time "endeavored to improve the proposition so as to make it, as he thought, interesting to the bank, and said in effect that he [McCarthy] wanted to get something he could sell to the bank."

Finally, McCarthy's request that the plaintiff obtain a consolidation of the proposal of November 15 which the Niagara company had addressed to the plaintiff with the plaintiff's letter to the defendant of October 24 relating to the plaintiff's compensation was in substance a refusal to deal with the plaintiff in the matter of his commissions and an insistence upon a single proposal which might lead to a contract solely between the insurer and the defendant. The plaintiff's testimony shows that all proposals of the Niagara company submitted by him before the "consolidated" proposal of November 27 had been addressed by the company to the plaintiff. The first of these and ap-

parently the others as well contained provisions under which the plaintiff was to "service" the account by handling "details," adjusting minor losses when requested by the company and collecting and remitting to the company certificates issued to automobile owners and premiums received from the bank. None of these proposals before the "consolidated" one had been satisfactory to the defendant. We do not see how the request for a new "consolidated" proposal which should eliminate the plaintiff as a party contracting with the defendant, so that the plaintiff should look to the insurer alone for his compensation out of the premiums, can fairly be interpreted as an offer by the defendant, inconsistent with the whole previous course of dealing, to employ the plaintiff as its agent and to pay him a commission, if he secured the "consolidated" proposal. The final "consolidated" proposal of November 27 contained a reference to the plaintiff only as "being retained to service this account." The premium rates were increased over those included in the next preceding proposal of November 15 by an amount deemed sufficient to allow the insurer to pay the plaintiff's commissions out of premiums received. As to the difference between the proposal of November 15 and that of November 27, the plaintiff testified that the former "set forth in detail certain services that . . . [he] was to perform as broker, which were a matter between . . . [him] and the company," and that for that reason this part was left out of the "combined" proposal addressed by the company to the defendant. We have not overlooked the plaintiff's testimony that McCarthy said that "the consolidation of those two matters [the premiums and the plaintiff's compensation] was all that stood between our doing business." We read this in connection with the plaintiff's further testimony that the new "quotation" would be inclusive of the compensation he was to receive, "and the bank would have only one party [the insurance company] to deal with." The "doing business" to which McCarthy referred could only have meant doing business with the company in accordance with the requested "consolidated" proposal. This was

not an offer by the defendant to pay the plaintiff if he produced a "consolidated" proposal.

A mere indication of a willingness to receive proposals is not an offer which can ripen into a contract upon the submission of a proposal. There is no obligation to accept the most favorable proposal received or to accept any proposal at all. Any or all may be rejected for any reason or without any reason. *Edge Moor Bridge Works* v. *County of Bristol*, 170 Mass. 528. *Montgomery Ward & Co.* v. *Johnson*, 209 Mass. 89. Am. Law Inst. Restatement: Contracts, § 25.

Even if we assume that there was evidence to contradict the finding of the auditor that McCarthy had no final authority in the matter, the plaintiff cannot recover upon any theory that the defendant engaged him as its broker to produce an insurer ready, willing and able to provide insurance upon terms satisfactory to the defendant, and that by the "consolidated" proposal of November 27 the plaintiff did produce such an insurer. The conditional offer to the broker of a commission apart from the purchase price (here the premiums) which is impliedly made by an owner of real estate who lists it for sale with a broker under the rule of such cases as *Fitzpatrick* v. *Gilson*, 176 Mass. 477, *Elliott* v. *Kazajian*, 255 Mass. 459, and *John T. Burns & Sons Inc.* v. *Hands*, 283 Mass. 420, was never made by the defendant to the plaintiff in this case. There is nothing in the evidence to show the existence of a business custom or usage that the insured should pay an insurance broker's commission similar to the general practice out of which the legal implication of an offer by the real estate owner to the real estate broker originally sprang. The evidence shows that the defendant merely asked for proposals from brokers instead of making any offer and falls short of showing that it at any time impliedly or expressly employed or offered to employ the plaintiff. *Cook* v. *Welch*, 9 Allen, 350. *McKeon* v. *Tyler*, 254 Mass. 142. *McAuslan* v. *Nolan*, 254 Mass. 363. *Yurgelun* v. *Emery*, 282 Mass. 571. See *Cramer* v. *Wood*, 302 Mass. 161. In *Hall* v. *Grace*, 179 Mass. 400, *Maxwell* v. *Massachusetts Title Ins. Co.* 206 Mass. 197,

*Gordon* v. *First Universalist Society of Marlborough,* 217 Mass. 30, and in the cases from courts in other jurisdictions upon which the plaintiff largely relies the employment of the broker by the defendant was either conceded or proved.

As there was no evidence that the defendant employed the plaintiff, the defendant cannot be held on the theory that it terminated an employment in bad faith when the plaintiff was on the eve of completing negotiations successfully. See *Leonard* v. *Eldridge,* 184 Mass. 594; *Cadigan* v. *Crabtree,* 186 Mass. 7, 13; *S. C.* 192 Mass. 233. The theory of these cases is that a revocation of the broker's authority in bad faith is invalid and legally ineffective. *O'Connell* v. *Casey,* 206 Mass. 520, 528. *Elliott* v. *Kazajian,* 255 Mass. 459, 462. That principle applies only where there has been an employment. *McKeon* v. *Tyler,* 254 Mass. 142, 145.

Nor can the plaintiff recover on the theory that a quasi-contract has arisen in his favor by operation of law because the defendant has been unjustly enriched through availing itself of the plaintiff's work without paying for it. The defendant has nothing belonging to the plaintiff which it can or should restore or pay for. If the defendant did not employ the plaintiff it does not owe him for services. In fact the defendant never actually availed itself of any proposal made by the plaintiff. The contract of insurance which was finally entered into differed from the plaintiff's last proposal. It was with a different company. See *Holton* v. *Shepard,* 291 Mass. 513, 521. It was at first a mere oral binding subject to future negotiations which resulted in the issuance of a policy also in a different company, with "service" by a different broker from any proposed by the plaintiff. To be sure the defendant got the benefit of the rates proposed by the plaintiff, and this may have been important; but what the rates would have been, if they had not been the plaintiff's rates, remains speculative. It has been held in a number of cases that deriving benefit from the broker's work does not lead to liability where there has been no employment. *Leonard* v. *Eldridge,* 184 Mass. 594, 595, 596. *Johnstone* v. *Cochrane,* 231 Mass.

472, 479. *McKeon* v. *Tyler,* 254 Mass. 142, 144, 145. See *Altman* v. *Goodman,* 255 Mass. 41, 44, 45.

On the whole case we feel compelled to the conclusion that the plaintiff assumed the business risk of being able to persuade the defendant to deal through him; that there was no evidence upon which findings essential to the making out of a case for the plaintiff could have been made; and that the ruling of the judge to that effect was right.

*Exceptions overruled.*