PHOENIX SPRING BEVERAGE COMPANY *vs.* HARVARD BREWING COMPANY & others.

Worcester. September 21, 1942. — December 2, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, COX, & RONAN, JJ.

*Contract*, What constitutes, Construction, Termination. *Agency*, Termination of agency. *Evidence*, Extrinsic affecting writings. *Equity Pleading and Practice*, Master: exceptions to report.

Of two letters written by a manufacturer to one of his distributors, the first in effect stating that the manufacturer intended "at no time" to withdraw the agency from the distributor so long as he performed satisfactorily but also stating that the manufacturer would be "glad to offer" the distributor "a contract" and that his representative would discuss with the distributor "our future mutual relations, in detail," and the second, specifically assented to by the distributor in writing, "confirming" his appointment as distributor for a specified territory and stating certain terms of the relationship, the second letter and the assent thereto alone constituted the contract between the parties.

An unequivocal written contract, whereby a manufacturer appointed an exclusive distributor for his product in a certain territory without specifying the term of the relationship, was terminable by either party at will upon reasonable notice.

A master's admission of evidence of a custom as bearing on an interpretation that a contract in writing, which was the basis of the suit, was terminable at will, and his finding that both parties believed and knew it to be so, were not harmful where the contract was unequivocal and the proper interpretation of its provisions was that it was terminable at will.

BILL IN EQUITY, filed in the Superior Court on November 25, 1941.

Following confirmation of a master's report, the plaintiff appealed from a final decree dismissing the bill, entered by order of *Dillon*, J.

The evidence of a custom referred to in the opinion was testimony "that it was the custom of the trade in the com-

munity in which these sales were handled to terminate an agency with a distributor at any time."

In this court the case was submitted on briefs.

*S. M. Salny,* for the plaintiff.

*H. H. Hartwell & J. F. Driscoll,* for the defendant Harvard Brewing Company.

Cox, J. The plaintiff seeks to have the defendant Harvard Brewing Company, hereinafter referred to as the defendant, specifically perform an alleged agreement whereby the plaintiff was appointed an exclusive distributor in a certain district of merchandise manufactured by the defendant, and also to recover damages alleged to have been incurred by reason of the alleged wrongful termination of said agreement by the defendant. The relief originally sought on account of alleged misrepresentations by the defendant and discriminatory practices against the plaintiff is no longer an issue. The allegations in respect to these matters are not found to have been sustained. The suit was referred to a master, who states in his report that "his findings of fact, upon which" his "ultimate findings have been made, are based upon the subsidiary facts reported".

The master found that the plaintiff, a corporation organized on June 24, 1937, took over a business that had been conducted by a partnership under the name of Phoenix Spring Company. In February, 1935, this partnership was appointed as "exclusive draught distributor of Harvard products for a certain district." Provisions were made for the terms of credit upon which merchandise was to be sold to the partnership, and, thereafter, additional sales territory was assigned to it. On November 23, 1936, the defendant's president wrote the following letter to the partnership: "Gentlemen: It has been brought to my attention that rumors are being spread in the field, regarding the Harvard Brewing Co., to the effect that, sooner or later, we will withdraw the agency from you. These statements are untrue, and I will [*sic*] like to go on record and state that we have positively no intention of withdrawing the Harvard agency from you. I am glad to offer you a contract, to assure you that your Harvard franchise shall be

at no time in danger, as long as you are willing to represent us loyally and effectively. We leave nothing undone to give the public a quality product, and the Harvard franchise should prove increasingly valuable to you. Mr. Baumann will get in touch with you, within the very near future, and discuss with you our future mutual relations, in detail. Your kind cooperation with us is greatly appreciated, and I look forward to many years of mutually profitable business relations with you."

Under date of December 10, 1936, the partnership received the following communication that was signed in behalf of the defendant by its vice president: "Gentlemen: It is with great pleasure that we confirm your appointment as a selected case goods and draught goods distributor for the cities and towns listed on the attached sheet. Please sign and return this copy to us immediately. The success of our new sales policy is dependent upon exclusive case goods and draught goods sales rights. It is of the utmost importance that you respect territorial boundary lines at all times to insure your just share of profit, and to remain a Harvard distributor. Numerous distributors have been eliminated, in order to insure staple retail case goods prices. Please be advised that you cannot sell BELOW our established retail prices. You will note an increase in our draught goods prices, and a decrease in our case goods prices, and we are enclosing herewith our price list, as of December 14, 1936. The increase in draught amounts to 50¢ per half. The ever-increasing acceptance of Harvard bottle goods has made appreciable production savings possible. We are now ready to pass these savings on to our distributors. Reduced bottle goods prices will increase your volume and ours. Increased volume will bring Increased Profits to us all. We have great faith in your continued cooperation, and will do all we can to make the coming season a boom year for Harvard products, in bottles and in barrels." It seems that the following was attached to, or was a part of this communication: "December 14, 1936 I agree not to sell Harvard case goods BELOW the established retail prices, as shown on the attached sheet, and I acknowledge that

the following localities constitute the territorial limits of my present sales rights to Harvard Products . . . [the territory is set out in detail]. I further agree not to sell Harvard products to a sub-distributor or to any other wholesaler." "This agreement was executed by the plaintiff" and was sent to and received by the defendant.

Thereafter, the defendant made changes in the territory previously assigned, taking away several towns and one city. The plaintiff's treasurer objected to these changes and asked to have the territory restored, but it was not. He made no claim, however, that the defendant did not have the right to make such changes as it saw fit. There is a statement that any reference in the report to the plaintiff will be understood as " . . . [the treasurer] acting for and speaking for the plaintiff."

In the fall of 1940, arrangements were made for the giving of a bond or "guarantee" for the payment of the plaintiff's outstanding account. The question arose as to what assurance would be given to the signer of the bond as to the continuation of the territory that was then allotted to the plaintiff. "The defendant, thru its President, said that he had no intention of taking away the territory as long as he was satisfied with the financial set up and the volume of business and that the job was being well done," and it was arranged that if a bond or "guarantee" were given, then if the territory assigned to the plaintiff was either terminated or materially changed by the defendant, the bond and "guarantee" would likewise be terminated. The plaintiff's treasurer had knowledge of "that provision in the bond and guarantee."

For reasons that will hereinafter appear, it is unnecessary to recite at this time the findings of the master as to what took place thereafter, except to state that on November 14, 1941, the defendant notified the plaintiff by letter that it was "withdrawing . . . [its] franchise from your Company, as of November 30, 1941."

The plaintiff seasonably filed ten objections to the master's report, and also a motion to recommit the report, which was denied. The report was confirmed by interlocutory

decree, and by final decree the bill was dismissed with costs.

The plaintiff contends that the letter of November 23, 1936, is a part of the contract between the parties, and that the "contract" of December 14, 1936, "read in the light of and together with" this letter, shows a clear intention and purpose by the parties to have a contract of a "permanent" rather than of a "terminable at will" nature. The important question for determination is what the contract between the parties was.

It is a general rule that when several writings evidence a single contract between the parties, they will be read together in order to arrive at an interpretation of the contract. *Harding* v. *Broadway National Bank of Chelsea*, 294 Mass. 13, 19, 20, and cases cited. See *Williams* v. *Smith*, 161 Mass. 248, 252. But we are of opinion that the letter in question does not come within this rule. The occasion for writing the letter, in so far as the defendant is concerned, is stated in the first sentence of the letter. A positive statement of intention is made, as well as the statement of the willingness to offer the partnership a contract "to assure . . . [it] that . . . [its] Harvard franchise shall be at no time in danger, as long as . . . [it is] willing to represent us loyally and effectively." There are expressions in the letter of appreciation of the partnership's coöperation, and that the defendant looks "forward to many years of mutually profitable business relations." But the letter also contains the statement that the defendant's vice president, who appears to have been in charge of sales, "will get in touch with you, within the very near future, and discuss with you our future mutual relations, in detail." Whether this vice president and the then partnership ever got together for purposes of discussion does not appear. But on December 10, 1936, the defendant sent the partnership the second communication hereinbefore set out in detail. We think that the letter of November 23, 1936, at most, looks to the making of a contract, and that it cannot be regarded as a part of the contract that was made. A discussion of "our future mutual relations, in detail" is plainly

contemplated. If the letter contains expressions of a further intention, the intention also appears that the contract itself is to depend on later negotiations. A promise made with an understood intention that it is to be not legally binding, but only expressive of a present intention, is not a contract. *Wellington* v. *Apthorp*, 145 Mass. 69, 74. "Expectations and negotiations fall far short of a binding agreement." *Brighton Packing Co.* v. *Butchers' Slaughtering & Melting Association*, 211 Mass. 398, 405, and cases cited. *Stewart* v. *Johnson*, 252 Mass. 287, 290. *Rosenfield* v. *United States Trust Co.* 290 Mass. 210, 217. *Cronin* v. *National Shawmut Bank*, 306 Mass. 202, 210. See *Gascoigne* v. *Cary Brick Co.* 217 Mass. 302, 304; *Raynes* v. *Stevens*, 219 Mass. 556; *DeVito* v. *Boehme & Rauch Co.* 239 Mass. 290, 294; *Joseph Martin, Inc.* v. *McNulty*, 300 Mass. 573, 577. The case at bar is distinguishable from such cases as *Reliable Waste Co.* v. *Waterhead Mills, Inc.* 238 Mass. 496, *Avondale Mills* v. *Benchley Brothers, Inc.* 244 Mass. 153, 157, and *Brown* v. *Grow*, 249 Mass. 495, 500.

In the communication of December 10, 1936, the words, "we confirm your appointment," appear. If these words refer to the appointment that had previously been in force, the duration of that appointment is made no more certain or extensive. It is not contended by the plaintiff that prior to December 10, 1936, there was any appointment that was not terminable at will. If these words refer to what may have taken place at a discussion of "our future mutual relations, in detail," and there is no express finding that there was any such discussion, the fact remains that no definite term is expressed in the communication. "This agreement was executed by the plaintiff" and sent to the defendant, and, from what has been said, we think it follows that the partnership must be held to have been satisfied with it.

The agreement between the parties must be construed as one that was terminable at will by either party upon reasonable notice. *Emerson* v. *Ackerman*, 233 Mass. 249, 252. *Globe Paper Co. Inc.* v. *Russell Box Co.* 291 Mass. 1, 10. The case at bar is distinguishable from such cases as *Kirkley* v. *F. H. Roberts Co.* 268 Mass. 246, 252, and cases

cited. See *Pisco-Pausata* v. *Oliver Ditson Co.* 276 Mass. 377, 380; *Hayden* v. *Beane*, 293 Mass. 347, 351. The plaintiff does not contend that what took place at the time the bond or "guarantee" was given amounted to a modification of the agreement so as to fix a definite term of the plaintiff's employment.

The conclusion here reached is not adversely affected by any questions raised by the plaintiff's ten exceptions to the master's report or by the denial of its motion to recommit. Six of these exceptions relate to the failure of the master to make certain findings. The evidence is not reported, and no error in this respect appears on the face of the report. *Carleton & Hovey Co.* v. *Burns*, 285 Mass. 479, 483. *Zucker-nik* v. *Jordan Marsh Co.* 290 Mass. 151, 155. Two of the exceptions relate to the admission of evidence of an alleged custom. But inasmuch as the rights of the parties must be determined by the terms of the agreement that was made, unaffected by extrinsic evidence, the plaintiff was not harmed by the admission of this evidence. The same can be said as to the finding of the master that both the plaintiff and the defendant believed and knew that they had a right to terminate at will the agency or franchise. In the circumstances, the master was not required to make any finding as to damages. The motion to recommit was properly denied.

The master found that a reasonable notice of termination was given.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs.*