GALLAGHER, CHIEF OF POLICE OF SPRING-
FIELD, MASSACHUSETTS, ET AL. *v.* CROWN
KOSHER SUPER MARKET OF MASSACHU-
SETTS, INC., ET AL.

No. 11. Argued December 7–8, 1960.—Decided May 29, 1961.

*Joseph H. Elcock, Jr.,* Assistant Attorney General of
Massachusetts, argued the cause for appellants. With
him on the brief were *Edward J. McCormack, Jr.,* Attor-
ney General, *John Warren McGarry,* Assistant Attorney
General, *Arthur E. Sutherland* and *S. Thomas Martinelli.*

*Herbert B. Ehrmann* argued the cause for appellees. With him on the brief was *Samuel L. Fein.*

Briefs of *amici curiae,* urging affirmance, were filed by *Leo Pfeffer, Lewis H. Weinstein, Shad Polier* and *Samuel Lawrence Brennglass* for the Synagogue Council of America et al.; *Frederick F. Greenman, Arnold Forster, Paul Hartman, Theodore Leskes, Edwin J. Lukas* and *Sol Rabkin* for the American Jewish Committee et al.; *Reuben Goodman* and *Rowland Watts* for the American Civil Liberties Union et al.; and *William D. Donnelly* for the General Conference of Seventh-Day Adventists.

MR. CHIEF JUSTICE WARREN announced the judgment of the Court and an opinion in which MR. JUSTICE BLACK, MR. JUSTICE CLARK, and MR. JUSTICE WHITTAKER concur.

The principal issues presented in this case are whether the Massachusetts Sunday Closing Laws [1] violate equal protection, are statutes respecting the establishment of religion or prohibit the free exercise thereof.

Appellees are Crown Kosher Super Market, a corporation whose four stockholders, officers and directors are members of the Orthodox Jewish faith, which operates in Springfield, Massachusetts, and sells kosher meat and other food products that are almost exclusively kosher and which has many Orthodox Jewish customers; three of Crown's customers of the Orthodox Jewish faith, whose religion forbids them to shop on the Sabbath and requires them to eat kosher food, as representatives of that class

---

[1] The statutory sections immediately before the Court are Mass. Gen. Laws Ann., c. 136, §§ 5 and 6. The Massachusetts Sunday Closing Laws in their entirety may be found in Mass. Gen. Laws Ann., c. 136; c. 131, § 58; c. 138, §§ 12 and 33; c. 149, §§ 47 and 48; c. 266, §§ 113 and 117. Those sections considered particularly relevant are set forth in an Appendix to this opinion.

of patrons; and the chief orthodox rabbi of Springfield, as representative of a class of orthodox rabbis whose duties include the inspecting of kosher food markets to insure compliance with Orthodox Jewish dietary laws.

Crown had previously been open for business on Sunday, on which day it had conducted about one-third of its weekly business. No other supermarket in the Springfield area had kept open on Sunday. Since the Orthodox Jewish religion requires its members to refrain from any commercial activity on the Sabbath—from sundown on Friday until sundown on Saturday—Crown was not open during those hours. Although there is a statutory provision which permits Sabbatarians to keep their shops open until 10 a. m. on Sunday for the sale of kosher meat, Crown did not do so because it was economically impractical; for the same reason, Crown did not open after sundown on Saturday.

Those provisions of the law immediately under attack are in a chapter entitled "Observance of the Lord's Day." They forbid, under penalty of a fine. of up to fifty dollars, the keeping open of shops and the doing of any labor, business or work on Sunday. Works of necessity and charity are excepted as is the operation of certain public utilities. There are also exemptions for the retail sale of drugs, the retail sale of tobacco by certain vendors, the retail sale and making of bread at given hours by certain dealers, and the retail sale of frozen desserts, confectioneries and fruits by various listed sellers. The statutes under attack further permit the Sunday sale of live bait for noncommercial fishing; the sale of meals to be consumed off the premises; the operation and letting of motor vehicles and the sale of items and emergency services necessary thereto; the letting of horses, carriages, boats and bicycles; unpaid work on pleasure boats and about private gardens and grounds if it does not cause unreasonable noise; the running of trains and boats; the

printing, sale and delivery of newspapers; the operation of bootblacks before 11 a. m., unless locally prohibited; the wholesale and retail sale of milk, ice and fuel; the wholesale handling and delivery of fish and perishable foodstuffs; the sale at wholesale of dressed poultry; the making of butter and cheese; general interstate truck transportation before 8 a. m. and after 8 p. m. and at all times in cases of emergency; intrastate truck transportation of petroleum products before 6 a. m. and after 10 p. m.; the transportation of livestock and farm items for participation in fairs and sporting events; the sale of fruits and vegetables on the grower's premises; the keeping open of public bathhouses; the digging of clams; the icing and dressing of fish; the sale of works of art at exhibitions; the conducting of private trade expositions between 1 p. m. and 10 p. m.

These statutes do not prohibit Sunday business and labor by Sabbatarian observers so long as it disturbs no other person. However, this has been construed to forbid the keeping open of shops for the sale of merchandise. *Commonwealth* v. *Has,* 122 Mass. 40. Permission is granted by local option for the Sunday operation after 1 p. m. of amusement parks and beach resorts, including participation in bowling and games of amusement for which prizes are awarded. Special licenses for emergency Sunday work may be obtained from local officials.

Other provisions of the Massachusetts Sunday legislation make generally unlawful Sunday attendance or participation in any public entertainments except for those which are duly licensed locally, conducted after 1 p. m., and are in keeping with the character of the day and not inconsistent with its due observance.

Although there is a general bar of games and sports on Sunday, professional sports may be played between 1:30 p. m. and 6:30 p. m., and indoor hockey and basketball

any time after 1:30 p. m.; amateur sports may be played between 2 p. m. and 6 p. m.; this is all subject to local option and no game may be conducted within one thousand feet of any regular place of worship except in a public playground or park. There are specific bans on auto racing, horse racing, boxing and hunting with firearms. And there are a number of additional exemptions from the general proscription. Golf, tennis, dancing at weddings, concerts of sacred music and the celebration of religious customs or rituals are all allowed on Sunday as are the operation of miniature golf courses and golf driving ranges after 1 p. m. Motion pictures may be exhibited after this hour if a local license is obtained. Parades with music for certain commemorative purposes may be held on Sunday by veterans', civic, fraternal, policemen's and firemen's organizations providing that they are suspended while passing within two hundred feet of public worship services.

Persons who keep places of public entertainment or refreshment lose their licenses if they entertain, on Sunday, people other than travelers, strangers or lodgers. With limited exceptions, discharging firearms for sport except on one's own land, fishing for commercial purposes, and fishing with nets or spears are prohibited on Sunday. The use of gaming devices is not allowed. Outdoor exercise without the element of contest is generally permitted as is the taking of mammals by means of traps. Heavier penalties are imposed for the willful cutting and destruction of timber, shrubs, fruits or vegetables on Sunday than on other days of the week.

Still other statutory sections make it a crime for most employers to require their employees to engage in ordinary occupation on Sunday unless the employee is allowed twenty-four consecutive hours off during the following six days. The sale of alcoholic beverages by certain

licensees is permitted on Sunday after 1 p. m., by local option. However, patrons consuming the beverages on the premises must be seated at tables.

Appellees sought permanently to enjoin the enforcement of the statute against them, alleging that appellant, Springfield's chief of police, had previously arrested and prosecuted Crown's manager for keeping open on Sunday; that, unless restrained, appellant would continue to enforce the statute against Crown; that the statute was unconstitutional for the reasons stated above. The three-judge Federal District Court, one judge dissenting, agreed with appellees, 176 F. Supp. 466. On appeal brought under 28 U. S. C. § 1253, we noted probable jurisdiction, 362 U. S. 960.

## I.

The equal protection arguments advanced by appellees are much the same as those made by appellants in *McGowan* v. *Maryland, ante,* p. 420. They contend that the exceptions to the statute are so numerous and arbitrary as to be found to have no rational basis; [2] that the law permits the sale of certain food items sold by Crown but limits this permission to selected types of stores; that the employees in the exempted activities are just as much in need of a day of rest as are Crown's employees. The three-judge District Court described the present statutory system as an "unbelievable hodgepodge" and sustained appellees' allegations.

The answers to these arguments are likewise similar to those given in *McGowan* when the contentions are examined under the standards set forth in that opinion. Many of the exceptions in the Massachusetts Sunday Laws are

---

[2] A similar argument made is that the exemptions from the statutes' proscription "eat up the rule," bear no rational relationship to the alleged interest of the State and therefore violate due process.

reasonably explainable on their face. Such items as tobaccos, confectioneries, fruits and frozen desserts could have been found by the legislature to be useful in adding to Sunday's enjoyment; such items as newspapers, milk and bread could have been found to be required to be sold fresh daily.[3] It is conceivable that the legislature believed that the sale of fish and perishable foodstuffs at wholesale would not detract from the atmosphere of the day, while the retail sale of these items would inject the distinctly commercial element that exists during the other six days of the week. It is fair to believe that the allowance of professional and amateur sports on Sunday would add to the day's special character rather than detract from it. And the legislature could find that the circumstances attendant to the conduct of professional sports are sufficiently different from those of amateur sports to justify different treatment as to the hours during which they may be played. Furthermore, the legislature could determine that, although many retailers, including Crown, sell frozen desserts, to permit only a limited number of innholders, druggists and common victuallers to sell them on Sunday would serve the public purpose of providing these items on Sunday and, at the same time, limit the commercial activities ordinarily attendant to their sale. And, if such determination requires this limited number of stores to be open to serve the public interest, the employees of most of the stores are still protected by the statutory provision giving the employees another day of rest. To permit all stores which sell the exempted products to remain open on Sunday but to limit them to the sale of the exempted items

---

[3] It may be noted that, contrary to the interpretation of the court below, since there is no restriction on the sale of milk, Crown may vend it at any time on Sunday.

might well be believed to impose near insuperable enforcement problems.

The fact is that the irrationality of these and the many other apparently reasonable distinctions has not been shown. The presumption of validity upon which the other classifications stand has not been dispelled. "A classification having some reasonable basis does not offend against [the equal protection] clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78. Thus, we hold that the Massachusetts Sunday Laws do not violate equal protection of the laws.

## II.

Appellees make several contentions that the statutes violate the constitutional guarantees of religious freedom. *First,* they allege that the statutes are laws respecting an establishment of religion in that both their original and current purposes are to enforce the observance of Sunday as the Sabbath.

We agree with the court below that, like the Sunday laws of other States, the Massachusetts statutes have an unmistakably religious origin. The first enactment of the Plymouth Colony in 1650 stated simply that "whosoever shall prophane the Lords day by doeing any servill worke or any such like abusses" shall either be fined or whipped. The Compact, Charter and Laws of the Colony of New Plymouth, 92. Eight years later, a ban on Sunday traveling was enacted with the following preamble:

> "Wheras complaint is made of great abuses in sundry places of this Govrment of prophaning the Lords day by travellers both horse and foot by bearing of burdens carrying of packes &c. upon the Lords day to the great offence of the Godly welafected among us." *Id.,* at 113.

And, in 1671, the religious purpose was made clear beyond
doubt:

> "9. This Court taking notice of great abuse, and
> many misdemeanours, committed by divers persons
> in these many wayes, Profaneing the Sabbath or
> Lord's-day, to the great dishonour of God, Reproach
> of Religion, and Grief of the Spirits of God's People
>
> "Do therefore Order, That whosoever shall Pro-
> phane the Lord's-day, by doing unnecessary servile
> Work, by unnecessary travailing, or by sports and
> recreations, he or they that so transgress, shall
> forfeit for every such default forty shillings, or be
> publickly whipt: But if it clearly appear that the
> sin was proudly, Presumptuously and with a high
> hand committed, against the known Command and
> Authority of the blessed God, such a person therein
> Despising and Reproaching the Lord, shall be put
> to death or grievously punished at the Judgement
> of the Court.
>
> "10. And whosoever shall frequently neglect the
> public Worship of God on the Lords day, that is
> approved by this Government, shall forfeit for every
> such default convicted of, ten shillings, especially
> where it appears to arise from negligence, Idleness or
> Prophaness of Spirit." *Id.,* at 247.

The Sunday regulations of the Massachusetts Colony
were no different. The 1653 version spoke of the abuses
of the Dishonor of God and the Reproach of Religion
which were Grieving the Souls of God's Servants. Among
other things, the statute forbade Drinking and Sporting
on Sunday. The Colonial Laws of Massachusetts 132–
133. In 1665, Neglect of God's Public Worship was made
a crime. *Id.,* at 133. Every person was required to
apply himself to Duties of Religion and Piety on Sunday
according to the 1692 statute which continued the ban on

Sunday sports.  Charter of the Province of the Massachusetts-Bay in New-England 13–14.  The preamble to the new statute in 1761 retained the Religion and Piety language and added that Profanation of the Lord's Day is highly offensive to Almighty God.  This statute retained and strengthened the former prohibitions.  *Id.,* at 392–394.

A change came about in 1782.  The preamble added the following:

> "Whereas the Observance of the Lord's Day is highly promotive of the Welfare of a Community, by affording necessary Seasons for Relaxation from Labor and the Cares of Business; for moral Reflections and Conversation on the Duties of Life, and the frequent Errors of human Conduct; . . ."  Acts and Laws of the Commonwealth of Massachusetts 63.

Thus, the statute's announced purpose was no longer solely religious.  But this statute proscribed the Sunday attendance at any Concert of Music and Dancing in addition to the previously mentioned activities.  *Ibid.*  This law was re-enacted in 1792.  2 Laws of Massachusetts 536 *et seq.*

However, when we examine the statutes now before the Court, we find that, for the most part, they have been divorced from the religious orientation of their predecessors.  The preambles' statements, in certain terms, of religious purpose exist no longer.  Sports of almost all kinds are now generally allowed on Sunday.  The absolute prohibition against alcoholic beverages has disappeared.  Concerts and dancing are permitted.  Church attendance is no longer required.

Admittedly, the statutes still contain references to the Lord's Day and some provisions speak of weekdays as being secular days.  Although § 2 of c. 136 excepts concerts of *sacred* music, the next clause of the section

permits free open-air concerts. It would seem that the objectionable language is merely a relic. The fact that certain Sunday activities are permitted only if they are "in keeping with the character of the day and not inconsistent with its due observance," does not necessarily mean that the day is intended to be religious; the "character" of the day would appear more likely to be intended to be one of repose and recreation. We are told that those provisions forbidding certain activities to be conducted within a set distance from a place of public worship are especially devoted to maintaining Sunday as the Sabbath. But because the State wishes to protect those who do worship on Sunday does not mean that the State means to impose religious worship on all. See *Everson* v. *Board of Education,* 330 U. S. 1, 16. Although many of the more recently allowed Sunday activities may not commence prior to 1 p. m., others may be undertaken at any time during the day. And the contention that evening church services are being protected cannot be maintained since most of those activities that begin after 1 p. m. may continue throughout the day.

Furthermore, the long list of exemptions that have been recently granted evidences that the present scheme is one to provide an atmosphere of recreation rather than religion. The court below pointed out that, since 1858, the statutes have been amended more than seventy times. It would not seem that the Sunday sales of tobacco, soda water, fruit, et cetera, are in aid of religion. It would seem that the operation of amusement parks and beach resorts is in aid of recreation.

An examination of recent Massachusetts legislative history bolsters the State's position that these statutes are not religious. In 1960, a report of the Legislative Research Council stated:

"In general, Sunday laws protect the public by guaranteeing one day in seven to provide a period of

rest and quiet. Health, peace and good order of society are thereby promoted. Such provision is essentially civil in character and the statutes are not regarded as religious ordinances." Report of the Legislative Research Council relative to Legal Holidays and their Observance, Mass. Leg. Docs., Sen. Doc. No. 525 (1960), 24.[4]

The earliest pronouncements of the Supreme Judicial Court of Massachusetts are further indication of the religious origin of the Sunday Laws. In *Pearce* v. *Atwood,* 13 Mass. 324, 348 (1816), it was stated that the statute's sole object was "ensuring reverence and respect for one day of the week, in order that religious exercises should be performed without interruption from common and secular employments." In *Bennett* v. *Brooks,* 91 Mass. 118, 119 (1864), the day was characterized as one "set apart for religious services and observances."

In 1877, a case arose in which a charge of violation of religious freedom was made. The Supreme Judicial Court relied on the Pennsylvania case of *Specht* v. *Commonwealth,* 8 Pa. 312, and stated clearly:

"It is essentially a civil regulation, providing for a fixed period of rest in the business, the ordinary avocations and the amusements of the community. If there is to be such a cessation from labor and amusement, some one day must be selected for the purpose; and even if the day thus selected is chosen because a great majority of the people celebrate it as a day

---

[4] A 1953 report concluded:
"The wave of materialism which is sweeping the country makes it most important that one day be set aside for worship, rest and to give all persons an opportunity to strengthen the bulwark of our American civilization—the home." Report of the Unpaid Special Commission to Investigate and Study the Provisions of the Laws Relating to the Observance of the Lord's Day, Mass. Leg. Docs., H. Doc. No. 2413 (1954) 9.

of peculiar sanctity, the legislative authority to provide for its observance is derived from its general authority to regulate the business of the community and to provide for its moral and physical welfare. The act imposes upon no one any religious ceremony or attendance upon any form of worship, and any one, who deems another day more suitable for rest or worship, may devote that day to the religious observance which he deems appropriate. That one who conscientiously observes the seventh day of the week may also be compelled to abstain from business of the kind expressly forbidden on the first day, is not occasioned by any subordination of his religion, but because as a member of the community he must submit to the rules which are made by lawful authority to regulate and govern the business of that community." *Commonwealth* v. *Has,* 122 Mass. 40, 42 (1877).

The court below characterized this decision as an *ad hoc* improvisation by the Massachusetts court. Of course, the court below was correct in deciding that it was not bound by the Massachusetts characterization of the statutes. See *Society for Savings* v. *Bowers,* 349 U. S. 143, 151. But ten years later, in *Commonwealth* v. *Starr,* 144 Mass. 359, 361, 11 N. E. 533, 534 (1887), another religious charge against the statute was made; it was rejected on the authority of *Has.*

As the court below pointed out, there have been several cases,[5] between 1877 and 1923, which gave a religious characterization to the statute. But in none of these cases was there a contention regarding religious freedom, and

---

[5] *Davis* v. *Somerville,* 128 Mass. 594 (1880) ; *Commonwealth* v. *Dextra,* 143 Mass. 28, 8 N. E. 756 (1886) ; *Commonwealth* v. *White,* 190 Mass. 578, 77 N. E. 636 (1906) ; *Commonwealth* v. *McCarthy,* 244 Mass. 484, 138 N. E. 835 (1923).

none of the cases stated the statute's purpose to be exclusively religious.[6]   Finally, in the only recent case passing on the Massachusetts Sunday Closing Laws, *Commonwealth* v. *Chernock,* 336 Mass. 384, 145 N. E. 2d 920 (1957), the court summarily dismissed the complainant's religious contention, relying on *Has.*

The relevant factors having been most carefully considered, we do not find that the present statutes' purpose or effect is religious.   Although the three-judge court found that Massachusetts had no legitimate secular interest in maintaining Sunday closing, we have held differently in *McGowan* v. *Maryland, supra.*   And, for the reasons stated in that case, we reject appellees' request to hold these statutes invalid on the ground that the State may accomplish its secular purpose by alternative means that would not even remotely or incidentally aid religion.

*Secondly,* appellees contend that the application to them of the Sunday Closing Laws prohibits the free exercise of their religion.   Crown alleges that if it is required by law to abstain from business on Sunday, then, because its owners' religion demands closing from sundown Friday to sundown Saturday, Crown will be open only four and one-half days a week, thereby suffering extreme economic disadvantage.   Crown's Orthodox Jewish customers allege that because their religious beliefs forbid their shopping on the Jewish Sabbath, the statutes' effect is to deprive them, from Friday afternoon until Monday of each week, of the opportunity to purchase the kosher food sanctioned by their faith.   The orthodox rabbis allege that the

---

[6] *E. g.,* "The Legislature intended by this statute to keep the ordinary places of traffic, business, and work closed on this day, so that those persons who desired to relax from labor and business, and attend to private and public worship, might not be disturbed by persons pursuing their worldly business and avocations in open shop." *Commonwealth* v. *Dextra,* 143 Mass., at p. 31, 8 N. E., at p. 759.

statutes' effect greatly complicates their task of supervising the condition of kosher meat because the meat delivered on Friday would have to be kept until Monday. Furthermore, appellees contend that, because of all this, the statutes discriminate against their religion.

These allegations are similar, although not as grave, as those made by appellants in *Braunfeld* v. *Brown, ante,* p. 599. Since the decision in that case rejects the contentions presented by these appellees on the merits, we need not decide whether appellees have standing to raise these questions.[7]

MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN concur in a separate opinion.

Accordingly, the decision below is                    *Reversed.*

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE HARLAN, see *ante,* p. 459.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *ante,* p. 561.]

[For dissenting opinion of MR. JUSTICE BRENNAN and MR. JUSTICE STEWART, see *post,* p. 642.]

## APPENDIX TO OPINION OF
## THE CHIEF JUSTICE.

MASSACHUSETTS GENERAL LAWS ANNOTATED, C. 136.

§ 1. *Lord's day, definition.* The Lord's day shall include the time from midnight to midnight.

§ 2. *Presence at games, sports, plays or public diversions on the Lord's day; exceptions.* Whoever on the

---

[7] Appellants have advanced several procedural arguments. Since these were briefed only as ancillary issues and were not orally argued, and since their determination is not necessary to the disposition of the major questions presented, we deem it inappropriate to pass upon them now.

Lord's day is present at a game, sport, play or public diversion, except a concert of sacred music, a public entertainment duly licensed as provided in section four or a free open air concert given by a town, or by license of the mayor or the selectmen, upon a common or public park, street or square, or except a game of golf conducted on an open air golf course, or except a game of tennis or dancing at a wedding or celebration of a religious custom or ritual if no charge is made for being present or for dancing, or except after one o'clock post-meridian a game of outdoor lawn bowling or the playing of golf or driving on an outdoor golf driving range or playing on a miniature golf course, so called, shall be punished by a fine of not more than five dollars. Whoever on the Lord's day takes part in any game, sport, play or public diversion, except as aforesaid, shall be punished by a fine of not more than fifty dollars. This and the following section shall not apply to amusement enterprises lawfully conducted under section four A or four B or to sports or games conducted in accordance with sections twenty-one to twenty-five, inclusive, in any city or town which accepts said sections or in accordance with sections twenty-six to thirty-two, inclusive, in any city or town in which said sections twenty-six to thirty-two are then in force.

§ 3. *Establishing and maintaining public entertainment on the Lord's day.* Whoever offers to view, sets up, establishes, maintains, or attempts to set up, establish or maintain, or promotes or assists in such attempt, or promotes, or aids, abets or participates in offering to view, setting up, establishing or maintaining any public entertainment on the Lord's day, except as provided in section two, unless such public entertainment shall be in keeping with the character of the day and not inconsistent with its due observance and duly licensed as provided in section four, or whoever on the Lord's day acts as proprietor, manager or person in charge of a game, sport, play or pub-

lic diversion, except a public entertainment licensed under section four and except as provided in section two, shall be punished by a fine of not more than five hundred dollars.

§ 4. *License to hold public entertainment on the Lord's day; application; fee; suspension; revocation; hearing.* Except as provided in section one hundred and five of chapter one hundred and forty-nine, the mayor of a city or the selectmen of a town may, upon written application describing the proposed entertainment, grant, upon such terms or conditions as they may prescribe, a license to hold on the Lord's day a public entertainment, including musical entertainment provided by mechanical or electrical means, in keeping with the character of the day and not inconsistent with its due observance, whether or not admission is to be obtained upon payment of money or other valuable consideration, and, if the proposed entertainment described in the application is solely for the exhibition of motion pictures, for the benefit of patrons in a public dining room or for the use of television, the use of radio, or musical entertainment provided by mechanical or electrical means, the mayor or selectmen may grant an annual license therefor; provided, that no such license shall be granted to have effect before one o'clock in the afternoon, nor shall it have effect unless the proposed entertainment shall have been approved in writing by the commissioner of public safety as being in keeping with the character of the day and not inconsistent with its due observance.   The application for the approval of the proposed entertainment by the commissioner shall be accompanied by a fee of two dollars, or, in the case of an application for the approval of an annual license, as herein provided, by a fee of fifty dollars.   Any such license may, after notice and a hearing given by the mayor or selectmen issuing the same, or by said commissioner, be suspended, revoked or annulled by the officer or board giving

the hearing. The foregoing provisions, insofar as they authorize any person to refuse to grant, or to suspend, revoke or annul a license upon the ground that the proposed entertainment is not in keeping with the character of the Lord's day or not consistent with its due observance, and insofar as they require written approval of the proposed entertainment by said commissioner, shall not apply to any person making an application for a license to exhibit motion pictures or for the use of radio or television on said day, nor to any license issued upon such application.

§ 4A. *Maintenance and operation of enterprises at amusement parks, beaches or resorts on the Lord's day; licenses; suspension; revocation.* The mayor of a city or the selectmen of a town, upon written application therefor, and upon such terms and conditions as they may prescribe, may grant licenses for the maintenance and operation upon the Lord's day at amusement parks or beach resorts, so called, in such city or town, of any enterprise hereinafter described, for admission to which or for the use of which a payment of money or other valuable consideration may or may not be charged, namely:— Bowling alleys, shooting galleries restricted to the firing therein of rifles, revolvers or pistols using cartridges not larger than twenty-two calibre, photographic galleries or studios in which pictures are made and sold, games, and such amusement devices as may lawfully be operated therein on secular days; provided, that no such license shall be granted to have effect before one o'clock in the afternoon, nor shall it have effect unless the proposed enterprise shall, upon application accompanied by a fee of two dollars, have been approved in writing by the commissioner of public safety as provided in the case of public entertainments under section four. Any licensee hereunder may distribute premiums or prizes in connection

with any game or device lawfully maintained and operated by him under authority hereof. Any such license may, after notice and a hearing given by the mayor or selectmen issuing the same, or by said commissioner, be suspended, revoked or annulled by the officer or board giving the hearing. So much of this section as relates to the maintenance and operation of bowling alleys shall not apply in any city or town which shall have accepted the provisions of section four B.

§ 4B. *Licenses for operation of bowling alleys on the Lord's day.* In any city which accepts this section by vote of its city council and in any town which accepts this section by vote of is inhabitants, the city council, with the approval of the mayor, or the selectmen, as the case may be, may grant licenses for the operation of bowling alleys on the Lord's day between the hours of one and eleven post meridian; provided, that no such license may authorize the operation of bowling alleys on Easter, or on Christmas day if such day falls on the Lord's day. Every license granted hereunder shall specify the location of the place of business in which the license is to be exercised, and the license shall not be valid in any other place. Bowling alleys operated under such licenses shall be operated subject to such regulations and restrictions as shall be prescribed from time to time by the city council, with the approval of the mayor, or by the selectmen. Said regulations and restrictions shall be stated in the license. Said licensing authorities may at any time and without previous notice revoke licenses issued under this section if they have reason to believe that any provision of this section, or of any regulation or restriction prescribed thereunder, is being or will be violated.

§ 5. *Keeping open shops or warehouses and conducting business or doing work on the Lord's day.* Whoever on the Lord's day keeps open his shop, warehouse or work-

house, or does any manner of labor, business or work, except works of necessity and charity, shall be punished by a fine of not more than fifty dollars.

§ 6. *Limit of operation of section 5.* The preceding section shall not prohibit the manufacture and distribution of steam, gas or electricity for illuminating purposes, heat or motive power; the distribution of water for fire or domestic purposes; the use of the telegraph or the telephone; the manufacture and distribution of oxygen, hydrogen, nitrogen, acetylene and carbon dioxide; the retail sale of drugs and medicines, or articles ordered by the prescription of a physician, or mechanical appliances used by physicians or surgeons.

Nor shall it prohibit the retail sale of tobacco in any of its forms by licensed innholders, common victuallers, druggists and newsdealers whose stores are open for the sale of newspapers every day in the week; the retail sale of bread, before ten o'clock in the forenoon and between the hours of four o'clock and half past six o'clock in the afternoon by licensed innholders and by licensed common victuallers authorized to keep open their places of business on the Lord's day and by persons licensed under the following section to keep open their places of business as aforesaid; the retail sale of frozen desserts and/or frozen dessert mix, soda water and confectionery by licensed innholders and druggists, and by such licensed common victuallers as are not also licensed to sell alcoholic beverages, as defined in section one of chapter one hundred and thirty-eight, and who are authorized to keep open their places of business on the Lord's day; the sale of frozen desserts and/or frozen dessert mix, soda water, confectionery or fruit by persons licensed under the following section or the keeping open of their places of business for the sale thereof; the sale of live bait for use by fishermen for non-commercial purposes.

Nor shall it prohibit work lawfully done by persons working under permits granted under section nine; the sale by licensed innholders and common victuallers of meals such as are usually served by them, consisting in no part of alcoholic beverages, as so defined, which meals are cooked on the premises but are not to be consumed thereon; the operation of motor vehicles; the sale of gasoline and oil for use, and the retail sale of accessories for immediate necessary use, in connection with the operation of motor vehicles, motor boats and aircraft; the making of such emergency repairs on disabled motor vehicles as may be necessary to permit such vehicles to be towed or to proceed under their own power, and the towing of disabled motor vehicles; the letting of horses and carriages or of boats, motor vehicles or bicycles; the letting on trains of equipment or accessories for personal use in connection with outdoor recreation and sports activities; unpaid work on pleasure boats; the running of steam ferry boats on established routes; the running of street railway cars; the running of steamboat lines and railroad trains or of steamboats.

Nor shall it prohibit the preparation, printing and publication of newspapers, or the sale and delivery thereof; the wholesale or retail sale and delivery of milk, or the transportation thereof, or the delivery of frozen desserts or frozen dessert mix, or both, or the wholesale or retail sale of ice or of fuel; the transportation of general commodities by motor truck or trailers, then engaged in interstate commerce before eight o'clock in the forenoon and after eight o'clock in the evening or in the event of an emergency between the aforesaid hours; the transportation of petroleum products by motor truck or trailers then engaged in intrastate commerce before six o'clock in the forenoon and after ten o'clock in the evening; the transportation of livestock, farm commodities and farm equip-

ment for participation in fairs, exhibitions and sporting events and veterinary purposes; the handling, transportation and delivery of fish and perishable foodstuffs at wholesale; the sale at wholesale of dressed poultry, and the transportation of such poultry so sold, on the Lord's day next preceding Thanksgiving day, and on the Lord's day next preceding Christmas day except when Christmas day occurs on Saturday, the Lord's day or Monday; the making of butter and cheese; the keeping open of public bathhouses; the making or selling by bakers or their employees, before ten o'clock in the forenoon and between the hours of four o'clock and half past six o'clock in the afternoon, of bread or other food usually dealt in by them; whenever Rosh Hashonah, or the Day of Atonement, begins on the Lord's day, the retail sale and delivery of fish, fruit and vegetables before twelve o'clock noon of that day; the selling or delivering of kosher meat by any person who, according to his religious belief, observes Saturday as the Lord's day by closing his place of business during the day until six o'clock in the afternoon, or the keeping open of his shop on the Lord's day for the sale of kosher meat between the hours of six o'clock and ten o'clock in the forenoon.

Nor shall it prohibit the performing of secular business and labor on the Lord's day by any person who conscientiously believes that the seventh day of the week ought to be observed as the Sabbath and actually refrains from secular business and labor on that day, if he disturbs no other person thereby; the carrying on of the business of bootblack before eleven o'clock in the forenoon, unless prohibited in a city or town by ordinance or by-law; the digging of clams; the icing and dressing of fish; the cultivation of land, and the raising, harvesting, conserving and transporting of agricultural products during the existence of war between the United States and any other nation and until the first day of January following the termina-

tion thereof; such unpaid work in or about private gardens or private grounds, adjacent to a dwelling house, as shall not cause unreasonable noise, having regard to the locality where such work is performed.

Nor shall it prohibit the sale of catalogues of pictures and other works of art in exhibitions held by societies organized for the purpose of promoting education in the fine arts or the exposure of photographic plates and films for pleasure, if the pictures to be made therefrom are not intended to be sold and are not sold.

Nor shall it prohibit the conduct of any enterprise lawfully conducted under section four A or section four B.

Nor shall it prohibit the necessary preparation for and the conducting of private industrial trade expositions which are not open to the general public; provided, that said expositions shall be kept open only between the hours of one and ten o'clock post meridian.

Nor shall it prohibit the sale of fruit and vegetables by the person who raised the same, or by his agent thereunto duly authorized, on premises owned or leased by him.

§ 7. *Sale of frozen desserts, frozen dessert mix or confectionery on the Lord's day.* In Boston, and in any other city or town which accepts this and section eight or has accepted corresponding provisions of earlier laws, in a city by its city council or in a town by the voters of the town at an annual town meeting, the licensing board or officer in such city or town, or if there is no such board or officer the aldermen of a city, or if there are no aldermen the city council, with the approval of the mayor, or the selectmen of a town, may grant, to any reputable person who on secular days is a retail dealer in frozen desserts and/or frozen dessert mix, confectionery, soda water or fruit and who does not hold a license for the sale of alcoholic beverages, as defined in section one of chapter one hundred and thirty-eight, a license to keep open his place of business on the Lord's day for the sale of frozen des-

serts and/or frozen dessert mix, confectionery, soda water or fruit.

**§ 9. *Permit for performance of necessary work or labor on the Lord's day.*** The police commissioner of Boston, or any member of the police department having a rank not lower than that of captain and designated by said commissioner, or the chief of police or other officer in charge of the police department of any other city or of any town, or the chairman of the board of selectmen of any town, upon such terms and conditions as he deems reasonable, may issue a permit for the performance on the Lord's day of necessary work or labor which in his judgment could not be performed on any other day without serious suffering, loss, damage or public inconvenience. Such permit shall cover not more than one day and shall not be issued more than six days prior to the day for which it is issued.

**§ 21. *Athletic outdoor sports or games.*** In any city which accepts sections twenty-one to twenty-five, inclusive, by vote of its city council, or in any town which accepts said sections by vote of its inhabitants, it shall be lawful on the Lord's day to take part in or witness any athletic outdoor sport or game, as hereinafter provided, between the hours of one thirty and six thirty post meridian and, in the case of a baseball game commenced before the hour of six thirty post meridian, for such further time beyond said hour as may be necessary to complete said game; provided, that said game had been scheduled to commence at or before the hour of three post meridian, or is the second of two successive games to be played on the same day, the first of which had been scheduled to commence at or before the hour of two post meridian. In any such city or town it shall be lawful on the Lord's day to take part in or witness, as hereinafter provided, any indoor hockey or basketball game between the hours of one thirty post meridian and twelve midnight.

§ 22. *Licensed playgrounds or parks for athletic outdoor sports or games.* Such sports or games shall take place on such playgrounds, parks or other places as may be designated for that purpose in a license or permit issued by the city council, with the approval of the mayor, or by the selectmen; provided, that if, under any statute or ordinance, a public playground or park is placed under the exclusive charge and authority of any other officials, such officials shall, for that playground or park, be the licensing authority; and provided, that no sport or game shall be permitted in a place, other than a public playground or park, within one thousand feet of any regular place of worship.

§ 26. *Athletic outdoor sports or games not involving pecuniary reward, remuneration or consideration.* In any city or town wherein the corresponding provisions of this and the six following sections were in effect on the sixth day of December, nineteen hundred and twenty-eight, and which has not voted against said sections on resubmission as provided in section thirty-one, and has not accepted the provisions of sections twenty-one to twenty-five, inclusive, as provided in section twenty-one, it shall be lawful to take part in or witness any athletic outdoor sport or game, in which the contestants do not receive and have not been promised any pecuniary reward, remuneration or consideration whatsoever directly or indirectly in connection therewith, on the Lord's day between the hours of two and six in the afternoon as hereinafter provided.

§ 27. *Licensed playgrounds or parks for athletic outdoor sports or games not involving pecuniary award, remuneration or consideration.* Such sports or games shall take place on such playgrounds, parks or other places as may be designated for that purpose in a license or permit issued by the city council, with the approval of the mayor, or by the selectmen; provided, that if, under any statute or ordinance, a public playground or park is placed under

the exclusive charge and authority of any other officials, such officials shall, for that playground or park, be the licensing authority; and provided, that no sport or game shall be permitted in a place, other than a public playground or park, within one thousand feet of any regular place of worship.

MR. JUSTICE BRENNAN and MR. JUSTICE STEWART dissent. They are of the opinion that the Massachusetts statute, as applied to the appellees in this case, prohibits the free exercise of religion. See their dissenting opinions in *Braunfeld* v. *Brown, ante,* pp. 610, 616.