Andre **LABRECQUE**, Plaintiff, Appellant,

v.

Alec W. **NICONCHUK**, d/b/a North Shore Laboratories, Defendant, Appellee.

No. 7766.

United States Court of Appeals, First Circuit.

May 10, 1971.

Philip G. Koenig, Boston, Mass., for plaintiff-appellant.

John A. McNiff, Peabody, Mass., for defendant-appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiff, a Canadian citizen, brought this diversity suit against defendant, a Massachusetts manufacturer of a tire repair product. Plaintiff claims that the defendant breached a contract granting an exclusive distributorship to him. In the alternative, he asks for damages in *quantum meruit*.[1] At the conclusion of the plaintiff's evidence and again after all the evidence was in, the defendant moved for a directed verdict. The district court denied both motions and sent the case to the jury. Before the jury had reached a verdict, the district court entertained a renewal of defendant's motion and directed a verdict. This appeal followed.

Viewing the evidence presented in the light most favorable to the plaintiff, White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 64 (1st Cir. 1970), the facts in the case may be stated as follows. In the early 1960s plaintiff owned a Canadian company which undertook the distribution of defendant's tire repair cord in Canada. At that time this item was being sold only in the New York City area. During this business relationship, the parties became personally acquainted. Between 1962 and 1967, they collaborated on a distinctive black and yellow striped design for defendant's new, improved tire repair cord, which defendant ultimately called "Seal n Heal Tiger Tails." As early as 1963, the parties discussed the possibility of plaintiff's selling "Tiger Tails" in the United States through his company. In 1964, for example, the defendant wrote that, when he started making the new repair cord, the plaintiff would "have full control over it." In 1965, however, plaintiff's Canadian company failed and plaintiff became merely an employee of its successor, which still handled defendant's products. The parties continued to discuss the sale and distribution of "Tiger Tails" in the United States. Plaintiff testified that he was to "be the only one distributing it in the United States." "Tiger Tails" became marketable in 1966 and was first sold in Canada through the successor company.

Beginning in September 1966, plaintiff and defendant discussed two methods for marketing the new product in the United States. One was by distributing it through Knicks Mend-Rite Company, a Kansas City organization. Plaintiff acted as defendant's represent-

---

1. A count based on Restatement, Contracts § 90 (1932), was waived at trial.

ative in trying to work out an agreement with Knicks, on the understanding that plaintiff would get a 10% commission on all sales made through Knicks. The second method was through the medium of the Automotive Accessories Show in New York City in February 1967. This annual show was attended by distributors from all over the United States. The parties planned to introduce "Tiger Tails" at the show and hoped that they could convince potential distributors to carry this product. Plaintiff travelled to Kansas City in December 1966 but came away without any definite decision from Knicks, whereupon the defendant decided to concentrate on the New York show. The parties agreed to share the expense of renting space at this show. Defendant testified that plaintiff was to benefit from the show by becoming "the distributor of the product in the United States after certain specifications that I outlined to him" before the show had been met. Defendant also testified that plaintiff had agreed "to meet such specifications."

As the show date neared, plaintiff began to urge that the parties enter into a written agreement. On January 22, 1967, plaintiff wrote, "I am preparing an agreement (contract) as agreed. Will send copy to be approved and for the signature before the show, as agreed." A few days later, he again wrote, "The contract to be signed before the show is to me a simple and honest procedure." On the day before the show opened, plaintiff again pressed defendant on the matter of a written contract, saying that defendant had promised him the distributorship. Defendant agreed that he had. Plaintiff stated that he would not go forward with the presentation at the show without a written agreement. However, defendant had had nothing drawn up, because he claimed he had been too busy preparing for the show, and plaintiff had only a hastily prepared document which he himself stated was full of mistakes and useless to sign. The parties then drew up a letter which is set forth in full in the margin.[2] Defendant then told the plaintiff that this letter "was as good as a contract." Plaintiff testified that the terms meant to be covered by this letter had been made on January 12 and were as follows:

" * * * [Defendant] said I had to form a distributing company in the United States after the show and as soon as possible. He said that I would have to pay cash, that the new company established would have to pay cash for all purchases. * * * That I was not to interfere or touch the New York City area business, not to touch the Canadian business whatsoever, and that I had full authority in the distributing and managing of the sales end of it, and I had two years to build up a volume of sales of a thousand kits per week. * * *

2. "February 4th. 1967
Mr. André Labrecque, M.Sc.
267 Lowell St.
Peabody, Mass.
U.S.A.
 Re: Exclusive Sales Rights in the United States for Seal n Heal Tiger Tails Black & Yellow (1966) Style Product covered by the U. S. Patent Number: 3,277,642
Dear Mr. Labrecque:
 For the purpose of an agreement to be signed as soon as possible, I realize that you are electing domicile at 267 Lowell St., Peabody, Mass. U.S.A.

 I herewith grant to André Labrecque, M.Sc. the exclusive distributorship of my product know [sic] as Seal n Heal Tiger Tails (Black & Yellow (1966) Style) covered by the U.S. Patent No. 3,277,642, in the territory of the United States with the exception of the New York City territory.
 This agreement to be covered in complete details by a contract to be signed by both parties concerned in the very near future.
 With best personal regards,
  Yours very truly,
/s/ Alec W. Niconchuk
 Alec W. Niconchuk,
 North Shore Laboratories, Owner"

That I would have to pay $3.60 a kit already packaged in blisters, and that I would have to take it from there and sell it at my price to the distributors."

According to the plaintiff, these were all the specifications to be included in the formal contract to be drawn up later.

During the New York show, defendant accused plaintiff, among other things, of selling to Canadian and New York customers and on February 10 sent plaintiff a letter terminating their business relationship.[3]

Since plaintiff's testimony was not in accord with his letter, the principal issue in this appeal is whether there was sufficient evidence for the jury to conclude that there was a definite oral contract between the parties.[4] Defendant advances several arguments to show that the parties intended to be bound only by a later written agreement. First, he points to language in the February 4th letter, which speaks of "an agreement to be signed as soon as possible" and states that "This agreement [is] to be covered in complete details by a contract to be signed by both parties concerned in the very near future." Reading this language in plaintiff's favor, we find nothing to contradict his

3. "NORTH SHORE LABORATORIES CORPORATION

Industrial Product Research & Development, P. O. Box 568, Peabody, Massachusetts 01961
Area Code 617
531–5954
531–4994

February 10, 1967

Mr. Andre Labrecque
7157 Nogent St.
St. Leonard, Montreal, Canada

Dear Andre,

I am herewith terminating my letter of understanding with you dated February 4, 1967 since you have already breached the provisions of the proposed contract between us as follows:

1. You agreed to form a distributing company in the United States to promote the product, Seal n Heal Tiger Tails. You then had me prepare business cards for you and Malgrand which cards implied that you and Malgrand were representatives of North Shore Laboratories whereas you are not. Stop using those cards.

2. Contrary to our understanding that I was to receive cash before shipping any orders you took one order for 50 kits on a net 30 day basis and one order for a trial kit sent C.O.D. both on order blanks stamped "North Shore Laboratories" instead of your proposed distributing company.

3. Despite the fact you assured me you had ample financial backing for the proposed distributorship in the United States I have yet to see any evidence to support your claims.

4. Instead of acting as a distributor you have represented to prospective customers that you are the inventor, owner, and have complete control over my product.

5. We agreed that you were not to sell the product in Canada. Yet I know that you promised a Canadian buyer he could get a better deal by buying from you.

6. We agreed that you would refer all prospective buyers in the New York City area to our present distributor in that area. This you did not do in all instances.

There is other evidence of bad faith on your part but the above reasons I consider basic to our understanding. This breach of faith on your part would lead only to further suspicion and does not create a healthy business environment.

I appreciate the effort that you put into the presentation of my product at the New York show. Will you please itemize your expenses so that I can reimburse you as soon as possible.

I will always remain friendly toward you, Andre, but I know in my heart that any business association between us would be disastrous.

/s/ Alec W. Niconchuk
Best Regards, Alec W. Niconchuk"

4. In his pleadings defendant set up the defense of the Statute of Frauds, Mass. Gen.Laws ch. 259, § 1. However, he did not press this defense at trial.

assertion that the parties had worked out and agreed to the details. A provision for a formal memorial of the oral agreement is not necessarily inconsistent with an intent to be bound by the informal one. Nigro v. Conti, 319 Mass. 480, 482–483, 66 N.E.2d 353, 354 (1946). Defendant also emphasizes that plaintiff had urged that defendant prepare a formal agreement and had gone so far as to have one drawn up. But this does not show that plaintiff did not intend to be bound by an informal agreement once the letter was signed. In fact, the evidence indicates that plaintiff sought to be bound before the show took place in order to preserve the distributorship for himself. Moreover, the jury could find that the defendant also intended to be bound. The letter of February 4th was signed on a Sunday, and defendant himself testified that he warned plaintiff not to use the Sunday date, presumably for fear of invalidating its legal significance.[5] Also, when defendant wrote the letter of termination on February 10, he cited six instances in which, he claimed, plaintiff had "agreed" to do something under the "proposed contract" and had broken his promise. *See* note 3 *supra*. That plaintiff "agreed" to do something further indicates that the parties intended to be bound.

Defendant also argues that there is no evidence that all of the essential terms of the contract had been settled orally. But plaintiff's testimony was that the parties *had* agreed to certain elements essential to the contract and contemplated no others. These included: the parties; the distributorship territory; the product price; payment terms; control

of distribution; and the duration of the contract. In Rosenfield v. United States Trust Co., 290 Mass. 210, 216–217, 195 N.E. 323, 325–326 (1935), the plaintiffs relied on the fact that the parties had checked off items to be included in their agreement and then said that the "deal was closed." But the court found undisputed evidence that all material matters had *not* been agreed upon and hence that there was no contract. The instant case is the reverse side of the coin: despite evidence by defendant that he intended to include other material in the final contract, the jury was entitled to believe plaintiff's testimony that everything material had been settled.

The closest point in the case concerns the right to terminate. It is well settled that, without a term specifying duration, a distribution contract is a contract at will. Simons v. American Dry Ginger Ale Co., Inc., 335 Mass. 521, 524, 140 N.E.2d 649, 653 (1957); Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 506, 45 N.E.2d 473, 476 (1942). Defendant's reliance on such cases is ill-founded. His own testimony was that the plaintiff promised "to sell * * * the first year, 20,000 kits of this new product called Tiger Tail." Plaintiff had testified earlier that he "had two years to build up a volume of sales of a thousand kits per week." The jury could infer from this testimony that the contract was not to be at will, but rather that plaintiff was to have time to reach a certain sales figure so long as he abided by the other contract terms. Moreover, defendant further testified that the February 4th letter "would have to be followed in the near future by a con-

5. Defendant apparently was referring to the ancient Massachusetts rule that an agreement made on Sunday is unenforceable. Hunt v. Rhodes, 369 F.2d 623 (1st Cir. 1966); *see generally* Gallagher v. Crown Kosher Super Market of Massachusetts, Inc., 366 U.S. 617, 624–630, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961) (details of history). His attempts to avoid the consequences of this rule indicate that, far from thinking that no contractual relationship was being created, he was seeking to preserve it. We express no opinion as to whether the rule would actually have applied in this case since defendant has not urged it as a defense.

tract with terms similar to those I * * * outlined and similar to those I had given my other distributors." A copy of defendant's standard distributorship contract was in evidence, and, in substance, its scope was not much greater than the oral agreement described by the plaintiff. The latter had, in fact, previously signed such an agreement on behalf of his Canadian company. The jury could believe that the parties intended to adopt this standard agreement as the foundation for their contract. Having so found, it could then infer that the termination clause in the written contract was intended to apply. In other words, there was adequate proof that the parties had agreed upon duration, and it was for the jury to resolve the conflicting evidence and to decide upon its length.

Defendant argues that the plaintiff was contracting on behalf of a distribution company yet to be formed, and that no agreement with the company as obligor could result. John L. Whiting & Sons Co. v. Barton, 204 Mass. 169, 90 N.E. 528 (1910). We think there was ample evidence that the agreement here was with the plaintiff individually. Similarly, defendant's defense of accord and satisfaction on plaintiff's claim in *quantum meruit* was a jury question. Finally, even if the plaintiff failed to prove damages with certainty, a directed verdict was improper as plaintiff was entitled at least to nominal damages. Nathan v. Tremont Storage Warehouse, Inc., 328 Mass. 168, 171, 102 N.E.2d 421, 423 (1951).

Having determined that the jury should have been allowed to render a verdict, there is no need to decide whether the case should be reversed on the *quantum meruit* count alone.

Reversed and remanded for a new trial.