Kinder, C. Jeffrey, J.
INTRODUCTION
Plaintiff Fallon Clinic, Inc. (“Fallon”) is a large multi-specialty medical group practice located throughout central Massachusetts. Defendant Hubbard Health Systems, Inc. (“Hubbard”) operates Hubbard Regional Hospital, a 23-bed acute care adult hospital in Webster, Massachusetts. On November 2, 1994, Fallon leased a parcel of Hubbard’s property in Webster pursuant to the terms of a “Ground Lease.” The Ground Lease contains a rent escalation clause which is the source of this dispute. Hubbard claims that pursuant to the rent escalation clause, as of November 4, 2004 it is entitled to annual rent of 10% of the fair market value of the land and improvements, or roughly $23,958.33 per month. Fallon claims that they are obligated to pay 10% of the fair market value of the land only, or $3,750 per month. When the parties were unable to resolve their dispute, Fallon filed this declaratory judgment action seeking to enforce its interpretation of the Ground Lease. Hubbard counterclaimed that Fallon had breached the terms of the Ground Lease by failing to pay the $23,958.33 monthly rent. A 2-day jury-waived trial concluded on March 10, 2009. For the reasons that follow, judgment will enter for Fallon on its request for declaratory judgment. Judgment will enter for Fallon on Hubbard’s counterclaim.
FINDINGS Of FACT
I find the relevant credible facts as follows.
1. The Ground Lease
On or about November 21, 1994, Fallon and Hubbard executed a written lease agreement. The cover page bears the title “GROUND LEASET (the “Ground Lease”). (See Exhibit 13.) The cover page also identifies the Landlord as “Hubbard Health Systems, Inc.” (“Hubbard”), the tenant as “Fallon Clinic, Inc.” (“Fallon”) and the Premises as “Approximately, but no more than 25,000 square feet of land in Webster, Massachusetts.” (See Exhibit 13.) Although the typewritten square footage on both the cover page and in the definitional section regarding “Premises” on page one was “12,500 square feet of land,” the principals of Fallon and Hubbard lined through that figure and changed it to “25,000 square feet of land” in both places. (See Exhibit 13.) The change was dated and initialed by both signatories in both places. (See Exhibit 13.) Article I of the executed Ground Lease defines “Premises” as follows:
Premises: Approximately, but no more than, 25,000 square feet of land (the “Premises”) with an address of 340 Thompson Road, Webster, Worcester County, Massachusetts, designated as “PREMISES” on Exhibit A, and legally described on Exhibit B, which Premises are a part of the property designated as “Landlord’s Property” (the “Property”) on Exhibit A. The Premises includes all improvements, structures, and buildings now or hereafter located *538 thereon, and in common with others entitled thereto, all rights, privileges and easements appurtenant thereto including, without limitation, access over streets, ways, drives and the like serving the Premises.
(See Exhibit 13 at p. 1.) Contrary to Article I, Exhibit A to the executed Ground Lease, titled “plan designating the Premises,” defines “Premises” as “the land under the 24,800 square foot building as shown plus twenty feet around the structure on each side.” (See Exhibit 13.) Article I of the Ground Lease, separately defines “Building” as:
The office building to be constructed by Tenant on the Premises, which shall not be larger than 25,000 square feet, shall be architecturally compatible with the Hospital buildings presently existing on the Property, in accordance with plans and specifications subject to the Landlord’s approval pursuant to the terms hereof. At least three thousand (3,000) square feet of the said Building shall be leased to Landlord as unfinished space in accordance with the lease agreed to by the parties (the “Office Lease”).
(See Exhibit 13.)
The Ground Lease has a ninety-nine (99) year term. (See Exhibit 13 at p. 2.) Article III of the Ground Lease, titled “Term; Commencement Date; Landlord’s Work, Tenant’s Work and Date Premises Deemed Ready for Occupancy,” describes, among other things, the landlord’s and the tenant’s respective build-out obligations. (See Exhibit 13.) Section 3.3 of the Ground Lease provides in pertinent part:
Landlord’s Work. Except for Landlord’s Work, if any, as set forth in Exhibit D, the Premises shall be delivered “AS IS,” subject to all recorded matters, all applicable zoning, Laws and Insurance Regulations, as defined herein, and Landlord shall not be required to make any repairs nor replacements (hereafter jointly “Repairs”) or improvements, alterations or additions (hereafter collectively “Improvements”) to the Premises . . .
(See Exhibit 13 at p.4.) The only work the landlord, Hubbard, was required to perform under Exhibit D to the Ground Lease was as follows:
The landlord will arrange for and pay the first $500.00 of the fee for a pressure test on the 10,000 gallon oil tank located to the rear of the Human Services Building. The balance of the fee for testing with the exception of any fuel rental fee shall be shared equally between the landlord and the tenant. The landlord will locate and arrange for temporary oil storage for the Medical Office Building.
(See Exhibit 13, Ex. D.)
By contrast, Fallon’s build-out obligations were significant. Section 3.4 of the Ground Lease provides in pertinent part:
Tenant's Work. Upon delivery of possession. Tenant shall perform the work described on Exhibit E attached hereto, including without limitation (i) demolishing the existing building on the Premises; (ii) modifying the access road to the Premises; (iii) constructing the Building and connecting same to the existing Hospital building adjacent to the Premises; (iv) relocating the Landlord’s helicopter pad presently located on the Premises to the location shown on Exhibit F; and (v) constructing the Parking Lot for the use of 99 cars, 50 of which will be reserved for the non-exclusive use of the Tenant, its employees, visitors or business invitees as described in Section 2.3 and designated on Exhibit F
Tenant’s work will be prosecuted diligently to completion and will be done solely at Tenant’s expense.
(See Exhibit 13 at p. 4-5.) In short, Fallon was required to design and build, at its own expense, an approximately 25,000-square-foot medical office building under the terms of the Ground Lease. (See Exhibit 13 at pp. 1, 4-5, Ex. E.)
At the time the Ground Lease was executed there were a number of existing improvements already located on the ground on which Fallon was to construct the “Building.” (See Exhibit 13 at p. 4, Ex. E.) These improvements included (1) an existing “Human Services Building”; (2) a 10,000-gallon oil storage tank; and (3) a helicopter pad. (See Exhibit 13 at p.4.) Under the Ground Lease, Fallon, at its own expense, was obligated to (1) demolish the Human Services Building; (2) remove the oil storage tank; and (3) relocate the Landlord’s helicopter pad. (See Exhibit 13 at p. 4.) Fallon also bore all repair and maintenance obligations for the Building during the Ground Lease term and was required to maintain insurance during the term of the Ground Lease. (See Exhibit 13 at pp. 14-16.)
Article IV of the Ground Lease is entitled “Rent” and sets forth how the rent due under the Ground Lease is to be determined. (See Exhibit 13.) Section 4.1 of the executed Ground Lease provides in pertinent part:
Base Rent and Additional Rent. Tenant shall pay base rent monthly, in advance, beginning on the Commencement Date and on the first day of each calendar month thereafter, except that tenant shall have no obligation to pay base rent during any period of time that Landlord leases 3,000 square feet of office space in the Building from tenant at no cost to Landlord pursuant to the Office Lease. At such time as the Office Lease expires or terminates for whatever reason, the Tenant’s obligation to pay Base Rent hereunder shall immediately commence and a pro-rata adjustment shall be made if the Office Lease expires or terminates on a date which is not the last day of a month. Base rent for the first ten (10) Lease Years shall be $24,000.00per annum. Base rent for the remainder of the term shall be ten *539 percent (10%) of the Fair Market Value of the Premises (‘FMV’). The FMV shall be determined during the tenth Lease Year and every five years thereafter (each a “FMV Adjustment Year”) so that the effective date of any increase in the Base Rent shall be the tenth anniversary of the Lease and every fifth anniversary thereafter. Landlord and Tenant, on or before six (6) months prior to the end of the applicable FMV Adjustment Year, shall agree to the appointment of a mutually acceptable real estate appraiser with at least five years full time commercial appraisal experience in the area in which the Premises are located to appraise and set the FMV . .. Under no circumstances shall the monthly Base Rent set for any five-year Lease period be less than $2,000.00. Additional Rent, which includes Tax Rent and all other sums (except Base Rent) payable by Tenant, shall he paid when due.
(See Exhibit 13 at 6-7 (emphasis added).) Neither the Building nor any improvements are expressly included in Section 4.1 in connection with the calculation of Base Rent following the end of the tenth lease year or in the procedure for determining fair market value under that Section. (See Exhibit 13 at pp. 6-7.)
Section 4.3 of the Ground Lease concerns the amounts chargeable to Fallon under the Ground Lease as “Tax Rent.” Section 4.3 provides in pertinent part:
Tax Rent Tenant shall pay all Taxes levied or assessed against the Premises, the Building and all improvements thereon and Tenant’s Pro Rata Share of all Taxes attributable to Common Areas (“Tax Rent”). Taxes shall include real estate taxes, assessments, sales or use taxes, sewer entrance fees and other public charges, on or relating to the Premises including, without limitation, the Building, other improvements, land and personalty, on or relating to the Common Areas, taxes on rentals and taxes in addition to or in lieu of existing taxes, foreseen and unforeseen, ordinary and extraordinary, and all costs related to attempts to secure a refund or abatement (together called “Taxes”); provided Taxes shall not include franchise, estate, inheritance, succession, transfer, income or excess profits taxes assessed on Landlord . . .
(SeeExhibit 13 at 7-8 (emphasis added).) Thus, unlike the Base Rent provision, the Tax Rent provision expressly references both the Premises and the Building in connection with describing what Tax Rent Fallon is responsible for under the Ground Lease. The Premises and the Building are also treated separately in Section 6.2 of the Ground Lease which provides, in pertinent part, as follows:
6.2 Fixtures: Yield Up. Except as Landlord directs in writing Tenant shall remove its goods, effects, signs and trade fixtures and peaceably yield-up the Premises, including the Building and all other Improvements, broom-clean and in good order, repair and condition at the end of the Term or earlier termination of this Lease, . . . The Building and all other Improvements shall be the property of the Landlord at the end of the Term or earlier termination of this Lease . . .
2.The Office Lease
Contemporaneously with the execution of the Ground Lease, Fallon and Hubbard executed an Office Lease for up to 5,000 square feet of office suite space in the Building to be constructed by Fallon under the Ground Lease. (See Exhibit 20.) The Office Lease states in pertinent part as follows:
2. PREMISES. The TENANT hereby leases the following described premises: 340 Thompson Road, Webster, MA, an office suite containing up to 5,000 square feet, together with the right to use in common, with others entitled thereto, the building’s common areas. See Exhibit “A” attached hereto.
3. TERM. The term of the lease shall be for ninety-nine years, co-existent with the ground lease between Hubbard Health Systems, Inc. as Landlord and Fallon Clinic, Inc. as Tenant for approximately 25,000 square feet of land in Webster, MA dated November 15, 1994 and attached hereto as Exhibit “B.”
4. BASE RENT. The TENANT shall pay no base rent for 3,000 square feet of space so long as it occupies the leased premises. Consideration for the space under this lease is the TENANTS entering into a ground lease with the LANDLORD to be executed simultaneously with this lease for the property upon which the building in which the leased premises is located. While the TENANT under this lease occupies up to 3,000 square feet of space in this leased premises, the LANDLORD will pay no rent under the ground Lease. For reference, see the lease between Hubbard Health Systems, Inc. as Landlord and Fallon Clinic, Inc. as Tenant for approximately 25,000 square feet of land in Webster, MA dated November 15, 1994 and attached hereto as Exhibit “B.” For any space occupied by TENANT in excess of 3,000 square feet, the TENANT will pay rent equivalent to the LANDLORD’S actual cost of construction of the space based on a ten (10) year amortization schedule of construction costs. Cost of construction of the space shall include design, consulting and all construction expenses of every type.
(See Exhibit 20 at pp. 1-2 (emphasis added).) Thus, there are no payments due under either the Ground Lease or the Office Lease as long as Hubbard occupies at least 3,000 square feet of office space. (See Exhibit 20.)
3. The Appraisal
In or around July 2005, Commonwealth National Bank requested that Michael O’Hara (“O’Hara”) of O’Hara-Buthray Associates, Inc., conduct an appraisal of a portion of the real estate located at 340 Thompson Road, Webster, Massachusetts. (SeeExhib- *540 its 15, 37.) The appraisal set the fair market value of the land as improved with the Building at $2,875,000. (See Exhibits 15, 37.) The land alone was appraised at $450,000. (See Exhibits 15, 37.) O’Hara, whose testimony I credit, has over 21 years experience in conducting appraisals in Worcester County.
O’Hara was asked to do an appraisal by Commonwealth National Bank in connection with Hubbard’s application for a commercial loan from that financial institution. He had almost no contact with Fallon in connection with the appraisal. In formulating his opinion of value as to the land as if vacant and unimproved, O’Hara appraised approximately 2.25 acres. The area appraised included the foot print of the building and the parking areas adjacent to it. He used this 2.25-acre area based on a facsimile sent to him on July 21, 2005, by Attorney Stephanie William of the law office of Carmen A. Frattaroli & Associates, a firm representing Hubbard. (See Exhibit 15, Addendum; Exhibit 36.) O’Hara was aware that the Ground Lease stated that the Premises was 25,000 square feet. However, Commonwealth National Bank representatives instructed O’Hara to appraise the 2.25-acre area rather than 25,000 square feet, because any building would require parking. O’Hara opined that as of July 14, 2005, the land as if vacant and unimproved had a fee simple market value of $4.59 per square foot. (See Exhibits 15 and 37.)
In April 2008, O’Hara was retained by Fallon to do another appraisal to determine the retrospective value of the 2.25 acres as of November 21, 1994, so that the two appraised values could be compared “apples-to-apples.” Based on research of six comparable sales, O’Hara estimated the retrospective value of the 2.25 acres to be $115,000 per acre as a fee simple market value. This is equivalent to a fee simple market value of $2.65 per square foot as of November 21, 1994.
4. The Dispute
On or about August 17, 2006, Hubbard served a notice of default on Fallon (the “Notice of Default”) asserting that Fallon was in breach of its rent obligations because it was not tendering rent equivalent to ten percent (10%) of the July 2005 appraisal of the land as improved with the Building in the amount of $2,875,000.00 or $23,958.33 per month. (See Exhibit 14.) A dispute arose between Fallon and Hubbard as to whether the fair market value appraisal, which serves as the basis of the Base Rent calculation following the tenth lease year, is determined by an appraisal of the fair market value of the land only or by an appraisal of the fair market value of the land with improvements and Fallon filed a Complaint seeking a declaratory judgment on or about August 25, 2006.
5. The Ground Lease Negotiations
In or around late 1993 or early 1994, Fallon and Hubbard began negotiating for Fallon to occupy medical office space on the campus of Hubbard Regional Hospital (“HRH”) in Webster owned by Hubbard. (See Exhibits 2, 16.) Hubbard, through its counsel Brown Rudnick Freed & Gesmer (“Brown Rudnick”), proposed a 26-page first draft of the Ground Lease on or about March 24, 1994 (the “First Draft”). (See Exhibit 2.) The First Draft was sent by Jeffeiy Alexander, Esquire (“Attorney Alexander”) to Joseph Podbielski (“Dr. Podbielski”). (See Exhibit 2.) Attorney Alexander is a health care lawyer and was the attorney at Brown Rudnick that had the primary relationship with Hubbard. Dr Podbielski was the President of Fallon in 1994. (See Exhibit 13 at p. 27.)
The First Draft was authored by Carl E. Axelrod, Esquire (“Attorney Axelrod”), an experienced real estate practitioner at Brown Rudnick. He had significant experience in negotiating and drafting leases and estimated that he had been involved in between 75 and 100 leases as of the time of trial, some of which were ground leases. Attorney Axelrod was the primary draftsman of the Ground Lease.
The cover page of the First Draft Indicates a date of March 23, 1994, in the upper left hand corner and states at the bottom, that it is:
FROM THE OFFICE OF: BROWN, RUDNICK, FREED & GESMER ONE FINANCIAL CENTER BOSTON, MASSACHUSETTS 02111
The cover page of the First Draft contains the following identifications:
LANDLORD: Hubbard Health Systems, Inc.
TENANT: Fallon Clinic, Inc.
PREMISES: Approximately_ square feet of land in Webster, Massachusetts
(See Exhibit 2.)
“ARTICLE I — BASIC LEASE PROVISIONS,” of the First Draft contains, among other things, definitions for the Ground Lease. It also includes the following statement, which was not altered or changed in any draft and, as such, appears in the final version of the Ground Lease which was executed on November 21, 1994:
Each reference in this Lease to titles or terms contained in Article I shall be deemed to incorporate the applicable definitions or data. The Exhibits attached to this Lease are incorporated by reference.
(See Exhibit 2; see also Exhibit 13.)
Article I defines “Landlord” as Hubbard and “Tenant” as Fallon. It also contains the following definition:
Premises: Approximately _ square feet of land (the “Premises”) with an address of _, Webster, Webster County, Massachusetts designated as “PREMISES” on Exhibit A, and legally described on Exhibit B, which Premises are a part of the property designated as “Landlord’s Property” (the “Property”) on Exhibit A. The Premises includes all improvements, structures, and *541 buildings now or hereafter located thereon, and in common with others entitled thereto, all rights, privileges, and easements appurtenant thereto, including, without limitation, access over streets, ways, drives and the like serving the Premises.
[See Exhibit 2.)
The second sentence of the definition of “Premises” is Brown Rudnick’s language. (See Exhibits 2, 13.) That language never changed between March 23, 1994, when the First Draft was prepared by Brown Rudnick, and November 21, 1994, when the Ground Lease was executed by Dr. Podbielski and Roger W. Simpson, the President of Hubbard (“Mr. Simpson”). (See Exhibits 2, 13.)
The First Draft also contains the following definition on page one:
Building: The structure to be constructed by Tenant on the Premises, in accordance with plans and specifications subject to the Landlord’s approval pursuant to the terms hereof.
(See Exhibit 2.)
Page 2 of the First Draft also states in part as follows:
Base Rent:
Lease Year Annually Monthly
CPI Adjustment Percentage:
The First Draft also contains on page 2 a defined term, “Pro Rata Share” with respect to which the following is indicated:
Pro Rata Share: [equitable allocation of Common Area maintenance, if any must be determined] Initially _percent _%).
(See Exhibit 2 at p. 2.)
Hubbard’s First Draft of the Ground Lease also included the following proposed provision regarding Base Rent:
4.1 Base Rent and Additional Rents. Tenant shall pay Base Rent monthly, in advance, beginning on the Commencement Date and on the first day of each calendar month thereafter. Additional rent, which includes Operating Cost Rent, Tax Rent and all other sums (except Base Rent) payable by Tenant, shall be paid when due. If (i) Base Rent and/or any Additional Rent is not received by Landlord or otherwise paid by the due date or (ii) Tenant’s check is not honored, and because actual damages result from late payments and dishonored checks are difficult to Fix, Tenant agrees to pay $1,000.00 as liquidated damages for each late payment or dishonored check. In addition, Landlord may charge interest from the initial due date at the rate of the lesser of 18% or the maximum legal rate on all amounts not paid or received by Landlord within 5 days of the due date. If 2 or more of Tenant’s checks are dishonored, Landlord may demand all future payments be made by certified or bank check or money order. The late charge and interest payment do not modify Tenant’s obligation to pay Base Rent and Additional Rent when due nor is Landlord precluded from pursuing other remedies under the Lease or otherwise are available.
(See Exhibit 2.)
Although Base Rent and CPI Percentage Adjustment figures were not included in Brown Rudnick’s First Draft of the Ground Lease, a proposed rent structure is apparent from the face of the document. Namely, an agreed starting Base Rent with a periodic Consumer Price Index adjustment at set intervals throughout the term of the Ground Lease. (See Exhibit 2.)
On or about April 22, 1994, Fallon, through its Vice President for Administration, Robert E. Maher, Jr. (“Mr. Maher”), responded to the draft Ground Lease circulated by Hubbard. (See Exhibit 3.) Maher indicated, in part, that the proposed lease was “much more cumbersome than what should be required.” (See Exhibit 3.) As such, Fallon suggested that the parties work from a shorter, 9-page Land Lease which Fallon was using for another of its properties. (See Exhibit 3.) Fallon also provided a copy of a memorandum with preliminary comments on the First Draft of the Ground Lease from its counsel Lawrence A. Brodeur, Esquire (“Attorney Brodeur”). (See Exhibit 3.) Hubbard rejected Fallon’s proposed shorter base lease form and continued to work from its own form in each successive draft of the Ground Lease. (See, e.g., Exhibits 2-9, 11-13.)
By letter dated June 6, 1994, Attorney Brodeur provided comments and proposed revisions to the First Draft to Brown Rudnick. (See Exhibit 4.) Enclosed with that letter was a copy of the First Draft with Attorney Brodeur’s handwritten comments dated June 1, 1994. (See Exhibit 4.) Among Attorney Brodeur’s hand-written comments were two different requests for a rent proposal from Hubbard (one on the cover and one adjacent to “Base Rent” on page 2), a proposed 99-year term, and four different comments concerning the definition of “Premises” appearing on page one. (See Exhibit 4.)
Comment 3 from Attorney Brodeur on the definition of “Premises” reads as follows:
(3) By this description it appears that Fallon is leasing the building pad area only.
(See Exhibit 4 (emphasis in the original).) With respect to “CPI Adjustment Percentage” on page 2 of the First Draft of the Ground Lease, Attorney Brodeur wrote:
Rent should be fixed for a reasonable period, possibly 2 [second number illegible] or at a minimum 15 years. After this fixed rent period ends, the CPI adjustment can be applied subject to a reasonable cap.
*542 (See Exhibit 4.)
With respect to Section 4.6, “CPI Adjusted Rent," Attorney Brodeur wrote the following comment:
use Boston base not U.S. City average. Applicable after year 20 - cap at 3% annually.
(See Exhibit 4.)
On June 29, 1994, Attorney Axelrod forwarded correspondence and a redraft of the Ground Lease to Attorney Brodeur. (See Exhibit 5.) The second paragraph of Attorney Axelrod’s June 29th letter reads as follows:
My assumption is that the Lease Premises will consist of the building pad only and although not reflected in this redraft of the Lease, we recognize that if this is to be the case you will need some temporary easements during the construction phase.
(See Exhibit 5.) Attorney Axelrod understood Mr. Brodeur to be indicating by comment 3 that as he read the First Draft, the “Premises" was to be the building pad only. Mr. Axelrod understood Attorney Brodeur’s comment 3 to refer to the definition of “Premises.”
Gerald Barbini (“Mr. Barbini”) was carbon copied on Attorney Axelrod’s June 29th letter along with Attorney Alexander. (See Exhibit 5.) Mr. Barbini was a hospital administrator for Hubbard. The kinds of issues addressed in the June 29th letter were within Mr. Barbini’s areas of responsibility.
There is no evidence beyond the June 29th letter itself which reflects Hubbard’s intent and understanding with respect to the definition of “Premises,” in the June 1994 timeframe. Attorney Brodeur testified that it was his understanding that “Premises” meant building pad only. Attorney Brodeur elaborated that “building pad” meant the ground under the building or the building foot print.
On July 22, 1994, Brown Rudnick circulated another draft of the Ground Lease (the “July 22nd Draft”). (See Exhibit 6.) The July 22nd Draft was revised from the prior draft so that the definition of Building reads:
Building: The 20,000 square foot office building to be constructed by the Tenant on the Premises so as to be architecturally compatible with the Hospital buildings presently existing on the Property, in accordance with plans and specifications subject to the Landlord’s approval pursuant to the terms hereof. At least 5,000 square feet of the said Building shall be leased to Landlord at Tenant’s actual cost of the space.
(See Exhibit 6 at p. 1 (emphasis in original).) Although the July 22nd Draft still does not contain a proposed starting Base Rent, it does contain the same rent structure as the First Draft, a periodic CPI Adjustment to an agreed starting Base Rent at set intervals during the 99-year lease term. (Exhibit 6 atpp. 2, 6-8; Exhibit 2 at pp. 2, 5, 7-8.)
By letter dated August 4, 1994, Brown Rudnick sent the next draft of the Ground Lease dated August 3, 1994 (the “August 3rd Draft”), to Attorney Brodeur. (See Exhibit 7.) The August 4th cover letter proposes a ground lease rent of $10 per square foot and rejects Fallon’s proposal of a “twenty-year fixed rent and a mere 5% increase every ten years thereafter.” (See Exhibit 7.) Mr. Barbini is carbon copied on the letter. (See Exhibit 7.)
The cover of the August 3rd Draft indicates in the upper right hand corner an original draft date of March 23, 1994, a prior revision date of July 22, 1994, and a current revision date of August 3, 1994. (See Exhibit 7.) The cover also contains a revised identification of “PREMISES” which reads as follows: “Approximately +/- 22,000 square feet of land in Webster, Massachusetts.” (See Exhibit 7.) The first sentence of the definition of “Premises” on page one of the August 3rd Draft has been changed so that it reads as follows:
Premises: Approximately +/- 22,000 square feet of land with an address of_, Webster, Worcester County, Massachusetts, designated as “PREMISES” on Exhibit A, and legally described on Exhibit B, which Premises are part of the property designated as “Landlord’s Property (the “Property”) on Exhibit A.
(See Exhibit 7.)
In the August 3rd Draft, the “Base Rent” definition on page two has been changed to read as follows:
Base Rent:
I.ease Year Annually Monthly
1994-1999 220,000 $18,333.33
Every 5 years CPI Adjustment CPI Adjustment
Thereafter Percentage Percentage
(See Exhibit 7.)
The basic rent structure remains unchanged from prior drafts. The August 3rd Draft contemplates a fixed starting Base Rent which is to be held constant for a fixed period (5 years) and then adjusted periodically (every 5 years) throughout the 99-year Lease Term by a CPI Adjustment (75% of CPI). (See Exhibit 7 at pp. 2, 7-8.) The definition of “Premises” has no impact on the rent calculation under the August 3rd Draft.
According to appraiser Michael O’Hara, Hubbard’s proposed starting Base Rent was significantly over fair market value. Analyzing comparable sales, Mr. O’Hara arrived at a fair market value of $115,000 per acre for the +/- 2.25 acres or $2.65 per square foot for the Fee Simple Fair Market Value. He also arrived at a Fair Market Rent Rate of $26,000, triple net, as of November 21, 1994 for the +/- 2.25 acres, or $0.27 per square foot.
*543 By letter dated August 10, 1994, Attorney Brodeur rejected the proposed ground rent rate of $10 per square foot on behalf of Fallon. (See Exhibit 8.) Attorney Brodeur proposed that the initial Base Rent be set as 10% of the fair market value of the land to be leased as “established by an arms length appraisal conducted by an MAI qualified appraiser.” (See Exhibit 8.) Attorney Brodeur also proposed that “(t]he base rent would be fixed for twenty (20) years and increase five (5) percent every ten (10) years thereafter.” (See Exhibit 8.)
Attorney Brodeur’s proposals were rejected and instead Hubbard responded by letter dated August 25, 1994, which enclosed a revised draft of the Ground Lease dated August 24, 1994 (the “August 24th Draft”), which contained, inter alia, a proposed initial Base Rent of $24,000 per year for the first ten Lease Years and a new rent adjustment methodology. (See Exhibit 9.) The August 25th cover letter states, in part, as follows:
I. The “Base Rent” for the ground lease is now defined on page 2 and the mechanics of the Base Rent adjustment on the tenth anniversary and every five years thereafter is set forth in Section 4.1. However, such “Base Rent” is not applicable unless the office lease expires or is terminated prior to the expiration of the ground lease. While the office lease is in existence neither Fallon nor Hubbard will have any obligation to pay the other Base Rent under the respective lease.
(See Exhibit 9.) The First sentence of the definition of “Premises” on page one of the August 24th Draft was changed to read as follows:
Premises: Approximately + 25,000 square feet of land (the “Premises”) with an address of 340 Thompson Road, Webster, Worcester County, Massachusetts, designated as “PREMISES” on Exhibit A, and legally described on Exhibit B, which Premises are a part of the property designated as “Landlord’s Property” (the “Property”) on Exhibit A.
[See Exhibit 9.)
The definition of “Building” was also changed on page one of the August 24th Draft so that it reads:
Building: The 20,000 square foot office building to be constructed by Tenant on the Premises so as to be architecturally compatible with the Hospital buildings presently existing on the Property, in accordance with plans and specifications subject to Landlord’s approval pursuant to the terms hereof. At least 3,000 square feet of said building shall be leased to Landlord as unfinished space in accordance with the lease agreed to by the parties (the “Office Lease”).
(See Exhibit 9.) In the August 24th Draft, the definition of “Base Rent” is changed to the following:
Base Rent:
Lease Year Annually Monthly
First 10 years $24,000 $2,000
Commencing on 10% of Fair 1/12 of
The 10th Market Value of Annual
anniversary the Premises as Rent
and every determined by
5 years there- appraisal but
after not less than
$24,000 annually
(See Exhibit 9.)
The definition of “CPI Adjustment Percentage” was deleted in the August 24th Draft in light of the newly proposed rent adjustment mechanism. (See Exhibit 9.)
The August 24th Draft contains a modified Section 4.1. Consistent with the August 25th cover letter, the provision has been re-written so that after Lease Year 10 and every 5 years thereafter, an appraisal is conducted and the Base Rent is set as 10% of the appraised Fair Market Value of the “Premises.” Specifically, Section 4.1 is re-written in the August 24th Draft to read in pertinent part as follows:
Base Rent and Additional Rent. Tenant shall pay base rent monthly, in advance, beginning on the Commencement Date and on the first day of each calendar month thereafter, except that tenant shall have no obligation to pay base rent during any period of time that Landlord leases 3,000 square feet of office space in the Building from tenant at no cost to Landlord pursuant to the Office Lease. At such time as the Office Lease expires or terminates for whatever reason, the Tenant’s obligation to pay Base Rent hereunder shall immediately commence and a pro-rata adjustment shall be made if the Office Lease expires or terminates on a date which is not the last day of a month. Base rent for the first ten (10) Lease Years shall be $24,000.00 per annum. Base rent for the remainder of the term shall be ten percent (10%) of the Fair Market Value of the Premises (“FMVj. The FMV shall be determined during the tenth Lease Year and eveiy five years thereafter (each a “FMV Adjustment Year”) so that the effective date of any increase in the Base Rent shall be the tenth anniversary of the Lease and every fifth anniversary thereafter. Landlord and Tenant, on or before six (6) months prior to the end of the applicable FMV Adjustment Year, shall agree to the appointment of a mutually acceptable real estate appraiser with at least five years full time commercial appraisal experience in the area in which the Premises are located to appraise and set the FMV . . . Under no circumstances shall the monthly Base Rent set for any five-year Lease period be less than $2,000.00. Additional Rent, which includes Tax Rent and all other sums (except Base Rent) payable by Tenant, shall be paid when due. In addition, Landlord may charge interest from the initial due date at the rate of the lesser of 18% per annum or the maximum legal rate on all amounts not paid or received by Landlord within 5 days of *544 the due date. If 2 or more of Tenant’s checks are dishonored, Landlord may demand all future payments be made by certified or bank check or money order. The interest payments do not modify Tenant’s obligation to pay Base Rent and Additional Rent when due nor is landlord precluded from pursuing other remedies under the Lease or as otherwise are available.
(See Exhibit 9 at pp.7-8.) Consistent with the change in the rent adjustment mechanism, Section 4.6, “CPI Adjusted Rent” is deleted in its entirety from the August 24th Draft. (See Exhibit 9 at p. 9.) There is no dispute that the re-written Section 4.1 was drafted by Brown Rudnick on behalf of Hubbard. (See Exhibit 9.)
On September 28, 1994, Attorney Brodeur’s office sent a facsimile letter to Attorney Axelrod confirming that an agreement had been reached. (See Exhibit 10.) The next day Hubbard issued a news release. The apparent purpose of the release was to advise the general public in the Webster area of the deal between Hubbard and Fallon and in a very general way the basic terms and purpose of the deal. More specifically, Hubbard publicized that: (1) Fallon would construct and “assume full ownership of the new two-stoiy building, while Hubbard Health Systems, Inc. retained] ownership of the land,” (2) the new building would provide “easy access to Hubbard’s outpatient ancillary services,” and that it was “anticipate^] that patients [would] utilize the hospital for laboratory, diagnostic imaging, physical therapy, and other an-cilliaiy services,” and (3) that “[t]his long anticipated joint venture [would] enhance the hospital’s viability . . .” (See Exhibit 17.) I find that Fallon’s payment of rent on the value of the Building would be inconsistent with its ownership of that property as reflected in the news release issued by Hubbard.
The first sentence of the definition of “Premises” on page one was revised from the prior draft and reads in the September 28th Draft as follows:
Premises: Approximately, but no more than, 25,000 square feet of land (the “Premises”) with an address of 340 Thompson Road, Webster, Worcester County, Massachusetts, designated as “PREMISES” on Exhibit A, and legally described on Exhibit B which premises are a part of the property designated as “Landlord’s Property” (the “Property”) on Exhibit A.
(See Exhibit 11.)
The definition of “Building” on page one was revised from the prior draft and reads in the September 28th Draft as follows:
Building: The office building to be constructed by the Tenant on the Premises, which shall not be larger than 22,500 square feet, shall be architecturally compatible with the Hospital buildings presently existing on the Property, in accordance with plans and specifications subject to the Landlord’s approval pursuant to the terms hereof. At least 3,000 square feet of the said Building shall be leased to the Landlord as unfinished space in accordance with the lease agreed to by the parties (the “Office Lease”).
Section 4.1 remains unchanged from the August 25th Draft and, in fact, does not change prior to execution of the Ground Lease on November 21, 1994. (See Exhibits 9, 11-13.)
By letter dated November 18, 1994, Attorney Ax-elrod sent out execution copies of the Ground Lease. (See Exhibit 12.) Attorney Axelrod’s cover letter is addressed to Attorney Brodeur’s partner, William Ahalt, and states, in part, as follows:
Please note that I have changed the square footage number of the land on both the cover page and in the definitional section of Premises appearing on page one of the Lease. As I understand it, the square footage of the two story building is less than 25,000 square feet (less than 11,500 square feet per floor square feet) and the square footage of the around constituting the lease premises is less than 12,500 square feet.
Please also note the change to the definition of Tenant’s Pro-Rata Share. As you and I previously discussed and I believe we agreed, the tenant’s pro rata share of real estate taxes on common area should be based upon the square footage of the lease premises compared to the land on which the hospital building sits.
(See Exhibit 12 (emphasis added).) As indicated in the cover letter, the square footage of the land was changed from 25,000 to 12,500 on both the cover and in the definition of “Premises” on page one. (See Exhibit 12.) The cover page of the execution copy of the lease also prominently bears the title “GROUND LEASE” underlined and in all capital letters.
The definition of “Tenant’s Pro-Rata Share” on page two has finally been filled in by Brown Rudnick in this version of the lease and, consistent with Attorney Axelrod’s cover letter, it reads as follows:
Tenant’s Pro-Rata Share: A fraction with the numerator equal to the square footage of the Premises and the denominator equal to the square footage of the foot print of the Landlord’s hospital building adjacent to the Premises.
{See Exhibit 12 at p. 2 (emphasis added).) Consistent with his November 18, 1994, cover letter, “Premises” in the Tenant’s Pro-Rata Share definition is intended to mean the “build pad only” or the “footprint” of the Building to be constructed by Fallon. (See Exhibit 2.) These comments are consistent with his understanding that the definition of “Premises” meant the “building pad only” as reflected in his June 29th letter five months earlier. (See Exhibits 5, 12.) This is also consistent with the inclusion of a $2,000 per month floor on rent in Section 4.1. There would be no reason *545 able likelihood that the fair market value of the “Premises” would fall below $240,000 for the land and Building in light of Fallon’s maintenance obligations with respect to the $2.6 million Building if “Premises” included the Building as Hubbard now contends.
Although the typewritten square footage on both the cover page and in the definitional section on page one had been changed from 25,000 to 12,500 by Attorney Axelrod in the execution copy of the Ground Lease, the principals of Fallon and Hubbard lined through that revision and changed it back to 25,000 square feet. (See Exhibit 13.) The change was dated and initialed by both signatories in both places. (See Exhibit 13.) As such, the executed cover page of the Ground Lease bears the title “Ground Lease” and identifies the “Premises” as “ [approximately, but no more than 25,000 square feet of land in Webster, Massachusetts.” (See Exhibit 13.) Similarly, the definition of “Premises” was also changed back to 25,000 square feet so that the first sentence reads:
Premises: Approximately, but no more than, 25,000 square feet of land (the “Premises”) with an address of 340 Thompson Road, Webster, Worcester County, Massachusetts, designated as “PREMISES” on Exhibit A and legally described on Exhibit B, which Premises are a part of the property designated as “Landlord’s Property” (the “Property”) on Exhibit A.
There is no direct record evidence as to the parties’ intent with respect to the strike through of the 12,500 square feet, although the strike through is noted to be consistent with the prior two drafts.
6. The Assignments
On September 30,1996, Fallon assigned its interest in the Ground Lease to Lakeside Realty Company (“Lakeside”). (See Exhibit 38.) Hubbard consented to this assignment. (See Exhibit 38.) There is no evidence that Fallon obtained a release of its obligations under the Ground Lease at the time of the assignment to Lakeside. Lakeside Realty Company was a Massachusetts general partnership and was an affiliate of Fallon which acted as a real estate holding company. (See Exhibits 29, 31, and 38.) In May 1997, Lakeside assigned its interest in the Ground Lease to MOB Realty Trust (“MOB”). (See Exhibits 29 and 31.) Hubbard consented to the assignment to MOB. (See Exhibit 31.) There is no evidence that either Fallon or Lakeside obtained a release of their obligations under the Ground Lease at the time of this assignment.
RULINGS OF LAW
1.Standing
A lessee cannot avoid its obligations to a lessor by making an assignment of its interest in the lease to another. See 68 Beacon Street, Inc. v. Sohier, 289 Mass. 354, 359 (1935). Although privity of estate is eliminated by the assignment, the lessee remains contractually liable on the lease if, for example, the assignee fails to pay the rent due. See 68 Beacon Street, Inc., 289 Mass, at 359. Although there were two assignments here, there was no release of Fallon by Hubbard. Accordingly, I find that Fallon remains liable on the Ground Lease. Therefore, as a threshold matter, I conclude that Fallon has standing to maintain this action. See Bello v. South Shore Hospital, 384 Mass. 770, 777-79 (1981) (for proposition that persons who are parties to a contract have standing to enforce it or to obtain a declaration of their rights under it); see Hillman v. Second Bank-State Street Trust Co., 338 Mass. 15 (1958); see also Kaplan v. Bowker, 333 Mass. 455, 459-61 (1956).
2. Ambiguity of Contract Terms
The preliminary issue of whether an ambiguity exists in a contract is itself a question of law. Air Plum Island, Inc. v. Society for the Preservation of New England Antiquities, 70 Mass.App.Ct. 246, 251 (2007); Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass.App.Ct. 502, 504-05 (2004). A contract term is ambiguous if it is susceptible of more than one meaning and reasonably intelligent persons could differ as to which meaning is the proper one. Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). Here, I conclude that there is a conflict in the Ground Lease between the first sentence of the definition of “Premises” which defines that term as “25,000 square feet of land” and the “land under the 24,800 square foot building” by the incorporation of Exhibit A into it, and the second sentence of the definition which would purport to include all improvements and buildings now or hereafter located thereon. I further find that reasonably intelligent people could disagree as to the proper construction of the term “Premises.” I conclude, therefore, that the definition of “Premises” in the lease agreement is ambiguous. See Citation Ins. Co., 426 Mass, at 381. Therefore, there is an ambiguity as to whether Section 4.1 and specifically the statement: “Base rent for the remainder of the term shall be ten percent (10%) of the Fair Market Value of the Premises (’FMVT means 10% of the land alone or 10% of the land plus all improvements thereon including the Building.
3. Construction of the Contract.
A contract should be construed “to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties.” Shane v. Winter Hill Fed. Sav. & Loan Ass’n, 397 Mass. 479, 483 (1986). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989); Vergato v. Commercial Union Ins. Co., 50 Mass.App.Ct. 824, 826 (2001). As a general rule, if the language is ambiguous, the writing is construed against the author of the doubtful language. Merrimack Valley Nat’l Bank v. Baird, 372 Mass. 721, 724 (1977); Wright v. Commonwealth, 351 *546 Mass. 666, 673 (1967). When a contract term is ambiguous, its import is ascertained from the parties’ intent as manifested by the contract’s terms and circumstances surrounding its creation, such as relationship of the parties, actions of the parties, and established business usages. See Merrimack Valley Nat’L Bank, 372 Mass. at 723-24. If parties execute two or more documents, with a manifested intent that the documents together express their agreement, the court must read the documents together, rather than construing each as if it stood alone. Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 212 (1995); Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 505 (1943); Harding v. Broadway Nat’l Bank of Chelsea, 294 Mass. 13, 19-20 (1936).
There is no dispute that Hubbard, through its counsel, drafted both the ambiguous definition of “Premises” and Section 4.1 of the Ground Lease. Accordingly, I conclude that the ambiguities in those provisions must be construed against Hubbard. See Merrimack Valley Nat’l Bank, 372 Mass. at 724; Wright, 351 Mass. at 673. Moreover, Hubbard will be held to any reasonable construction of those provisions relied upon by Fallon. See Merrimack Valley Nat’l Bank, 372 Mass. at 724; see also Hakim v. Massachusetts Insurers Insolvency Fund, 424 Mass. 275, 281 (1997).
Black’s Law Dictionary defines a “ground lease” as “[a] long-term (usu. 99-year) lease of land only. Such a lease typically involves commercial property, and any improvements built by the lessee usu. revert to the lessor. —Also termed ground-rent lease; land lease.” Black’s Law Dictionary, 908 (8th Ed. 2004). I conclude, based on this definition and the evidence at trial, that a ground lease is typically a lease of land only. I further conclude that the parties understood and intended that the definition of “Premises” included the building pad area plus some additional land around its perimeter as expressly indicated in Exhibit A to the Ground Lease. The term was not intended to include the Building constructed by Fallon at its own expense. I find that this construction is consistent with the contemporaneous statements of each side’s counsel during lease negotiations and drafting, is reasonable, and was relied upon by Fallon. Accordingly, I conclude that following Lease Year Ten, Section 4.1 requires periodic appraisals of the ground only, as if vacant and unimproved, and further, that following Lease Year Ten Base Rent is 10% of the fair market value of the ground only, as if vacant and unimproved.
4. Mutual Mistake and Reformation
“The phrase ‘a mutual mistake,’ as used in equity, means a mistake common to all the parties to a written contract or instrument, and it usually relates to a mistake concerning the contents or the legal effect of the contract or instrument.” Page v. Higgins, 150 Mass. 27, 30-31 (1889); see O’Reilly’s Case, 258 Mass. 205, 208 (1927). “It is well settled that, to entitle a party to a contract to have it reformed on the ground of mistake, it must appear that the mistake was mutual. Proof of mistake by one of the parties only is not sufficient. The mistake must be by both and in reference to the same matter.” Barrell v. Britton, 252 Mass. 504, 508 (1925); Ritson v. Atlas Assur. Co., 279 Mass. 385, 390 (1932).
A mistake as to the legal effect of the language employed in an instrument or in the use of technical language may be relieved upon proper proof. See Franz v. Franz, 308 Mass. 262, 267 (1941), citing Canedy v. Marcy, 13 Gray 373, 377 (1859); Reggio v. Warren, 207 Mass. 525, 533 (1911). “For relief‘It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention.’ ” Franz, 308 Mass. at 267 (quoting from 5 Williston, Contracts, Rev. Ed. §1585). “The usual remedy, when, by accident or mutual mistake, a written contract does not express the actual contract of the parties, is by a reformation or rectification of the writing, and this is a remedy for any party to the written contract, unless the statute of frauds prevents.” Page, 150 Mass, at 30.
To the extent that the definition of “Premises” could properly be construed to include the “Building” as Hubbard now contends, I find that this is a result of a mutual mistake between the parties as to the actual meaning of words used in defining “Premises.” I conclude that the Ground Lease should be reformed to make it conform with the expressed intentions of the parties through their counsel that “Premises” was intended to include the “building pad area only.” Accordingly, the definition of “Premises” is reformed by striking through the “or hereafter” in the second sentence. As thus reformed, the “Building” is not included within the definition of “Premises” and therefore comports with the parties’ mutual intent and understanding.
5. The Defendant’s Counterclaim
Hubbard has asserted a counterclaim alleging breach of contract for Fallon’s failure to make rent payments consistent with its interpretation of the rent escalation clause of the Ground Lease. Because I disagree with Hubbard’s interpretation of the Ground Lease rent escalation clause, judgment will enter for Fallon on Hubbard’s counterclaim.
ORDER
For the foregoing reasons, I conclude that following Lease Year Ten, Section 4.1 of the Ground Lease requires periodic appraisals of the ground only as if vacant and unimproved, and further that following Lease Year Ten Base Rent is 10% of the fair market value of the ground only, as if vacant and unimproved. Accordingly, it is ORDERED that judgment shall enter for Fallon on its request for declaratory judgment.
It is further ORDERED that judgment will enter for Fallon on Hubbard’s counterclaim of breach of contract.